**NATIVE VILLAGE OF VENETIE I.R.A. COUNCIL, Native Village of Fort Yukon I.R.A. Council, Nancy Joseph, and Maragaret Solomon, Plaintiffs,**

v.

**STATE OF ALASKA and John Pugh, in his official capacity as Commissioner of the Department of Health and Social Services, Defendants.**

No. F86–075 Civ.

United States District Court, D. Alaska.

May 13, 1988.

Judith K. Bush and Andrew Harrington, Alaska Legal Services Corp., Fairbanks, Alaska, for plaintiffs.

Douglas K. Mertz, Office of Atty. Gen., State of Alaska, Juneau, Alaska, for defendants.

## DECISION

KLEINFELD, District Judge.

This is evidently a test case brought by the plaintiffs to determine unsettled ques-

tions of the scope of the Indian Child Welfare Act. The plaintiffs seek to compel the state to recognize tribal court adoption decrees, although the tribal courts at issue have not taken the statutory steps to "reassume" jurisdiction. The two individual plaintiffs have refrained from adopting the children in state court, which would have resolved their individual problems, evidently in order to preserve standing for this case.

Two of the plaintiffs are the Native Village of Venetie and the Native Village of Fort Yukon Indian Reorganization Act Councils. The Native Villages are organized under the Indian Reorganization Act, 25 U.S.C. § 476 et seq. Also plaintiffs are Nancy Joseph and Margaret Solomon, described in the complaint as Native Athabaskan Indians from the Village of Fort Yukon. Venetie and Fort Yukon have populations as of the 1980 census of 132 and 586 respectively, and are 97.7% and 75.4% Native respectively. (Census data cited at plaintiffs' brief in support of motion for summary judgment, p. 6, fn. 9.)

Plaintiffs allege that Ms. Joseph obtained an order of adoption from the Tribal Court of the Native Village of Venetie on March 24, 1986, and unsuccessfully requested an amended birth certificate from the State of Alaska for the adopted child. Because the amended birth certificate was refused, she alleges, she was refused Aid to Families with Dependent Children benefits for the adopted child. Ms. Solomon allegedly followed the same course, having obtained her order from the Tribal Court of the Native Village of Fort Yukon.

Plaintiffs claim that they are entitled to have full faith and credit granted to the tribal court adoption orders under the Indian Child Welfare Act, 25 U.S.C. § 1901 et seq. They seek an injunction commanding the State of Alaska (1) to issue amended birth certificates to Joseph and Solomon based on the tribal court adoption decrees in these particular cases, and (2) to no longer refuse amended birth certificates to anyone on grounds of nonrecognition of tribal court decrees. They also seek a declaratory judgment that the state policy of refusing recognition to tribal court decrees violates the law.

Plaintiffs' motion for preliminary injunction was denied. This decision addresses the cross motions for summary judgment. Plaintiffs argue that there is no genuine issue of material fact, and that they are entitled to the relief requested as a matter of law. Defendants argue that dismissal is required under the Eleventh Amendment, and alternatively, that plaintiffs fail to state a claim upon which relief can be granted because the State's action was in accord with federal law.

The fundamental question in this case is whether the tribal courts have jurisdiction to issue adoption decrees, even though they have not complied with statutory provisions for reassuming such jurisdiction. The Constitution immunizes the defendants against plaintiffs' claims for money damages and declaratory relief regarding past conduct, but does not bar plaintiffs' prayer for an injunction. The injunction must be denied, however, because the tribal courts have not reassumed jurisdiction as provided for in the Indian Child Welfare Act. The tribal courts can obtain jurisdiction, but only by complying with the statutory procedures.

Some states, called "Public Law 280 states," operate under federal statutes stripping tribal courts of most of their traditional jurisdiction, and giving state courts jurisdiction over Indian country in most respects. Alaska is one of these states. In "P.L. 280 states," tribal courts must obtain Interior Department approval of their structures and procedures in order to obtain exclusive jurisdiction over child custody cases pursuant to the Indian Child Welfare Act. This is called "reassumption of jurisdiction" in ICWA language. The tribal courts in this case have not undertaken this "reassumption" process.

Plaintiffs concede that the tribal courts therefore cannot enjoy the exclusive jurisdiction conferred by the Indian Child Welfare Act. Plaintiffs argue that the tribal courts nevertheless retain a residue of concurrent jurisdiction, not abolished by P.L. 280, so that the tribal court decrees are entitled to full faith and credit under

ICWA. The source of this power, plaintiffs argue, is the inherent "tribal sovereignty" of the native villages bringing this action. This subtle argument requires extensive analysis of the doctrine of "tribal sovereignty" as well as the terms of the statutes. Although American law has always recognized "tribal sovereignty" for some purposes, the word "sovereignty" means less in this context than in ordinary English, and the concept cannot carry the freight with which plaintiffs would load it.

## THE ELEVENTH AMENDMENT

The Eleventh Amendment to the United States Constitution limits peoples' rights to sue state governments in federal courts. This is accomplished by limiting the jurisdiction of federal courts in suits against state governments. It is therefore necessary to determine what those limitations are, and how they apply to the plaintiffs' complaint.

As now construed by the Supreme Court, the Eleventh Amendment generally bars actions against state governments in federal court for money damages, but permits actions in federal courts against state government officials for prospective injunctive relief. Exceptions to the bar on damages relief exist, but none apply to this case. Eleventh Amendment jurisprudence has developed a great deal in the last few years, so a summary facilitates application to this case.

Defendants claim immunity from all of plaintiffs' claims under the Eleventh Amendment. Plaintiffs argue that the Eleventh Amendment immunity does not bar their action because they claim no retrospective damages, Congress has abrogated applicability of the Eleventh Amendment for Indian claims such as this, and the Amendment does not bar declaratory or injunctive relief. Neither side is entirely correct.

Originally, the United States Constitution provided that federal judicial power extended to controversies "between a State and Citizens of another State." U.S. Const., Art. III, § 2. Eight years after ratification, to reverse a Supreme Court decision, this provision was changed by the Eleventh Amendment. The Amendment provides as follows:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

The Amendment means both more and less than what it appears to say. No one would guess the judicially established meaning of the Amendment from its words.

One might think that the reference to "citizens of another state" would imply that the Amendment restricts suits only by persons from other states as well as foreigners, not actions by citizens of the same state, but that is not so. The Eleventh Amendment has long been construed to apply to citizens of the same state as well as other states. The theory was that it revived a general principle of sovereign immunity for states in federal courts, erroneously ignored by the Supreme Court decision which the Amendment reversed. *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

One might also think that the amendment erects the same bar to suits for injunctions as it does to actions for money damages, because it applies to "any suit in law or equity." Yet the Amendment has long been construed to allow actions in federal court for injunctions requiring states to obey the United States Constitution. The theory of this limitation is that when a state official acts unconstitutionally, the inability of the state legally to authorize his conduct strips it of its official or representative character. *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) (federal court can enjoin a state attorney general from enforcing a state statute which violates the Commerce Clause and the Fourteenth Amendment). The theory has the oddity of treating the state official's conduct as state action for purposes of conferring jurisdiction under the Fourteenth Amendment, but distinguishing it from state action to allow suit

in federal court despite the Eleventh Amendment. Doctrines, like people, are sometimes excused from the requirement of logical consistency when they are eighty years old.

■ The practical effect of the Eleventh Amendment is that "when a plaintiff sues a state official alleging a violation of federal law, the federal court may award an injunction that governs the official's future conduct, but not one that awards retroactive monetary relief." *Edelman v. Jordan,* 415 U.S. 651, 677, 94 S.Ct. 1347, 1362, 39 L.Ed.2d 662 (1974), as summarized in *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 103, 104 S.Ct. 900, 909, 79 L.Ed.2d 67 (1984). The bar erected by the Eleventh Amendment is not lifted by phrasing the relief as an injunction to pay money wrongfully withheld; whether phrased as an injunction or a damages award, retrospective relief requiring payment of money from the state treasury is barred. *Edelman,* 415 U.S. at 664, 94 S.Ct. at 1356. Nor can the federal court issue a declaratory judgment regarding past conduct. Such a declaratory judgment either operates as res judicata in a subsequent state proceeding for damages, or else is purposeless, so it is tantamount to a money judgment. *Green v. Mansour,* 474 U.S. 64, 73–74, 106 S.Ct. 423, 428–29, 88 L.Ed.2d 371, 380–381 (1985).

■ One exception to applicability of the Eleventh Amendment is waiver. States may waive their Eleventh Amendment sovereign immunity from retrospective damages liability, as by entering into a compact consenting to be sued, or by participating in a federal program for which Congress has clearly required consent to be sued in federal court as a condition for participation, at least if the program was created pursuant to Congress' authority to implement the Fourteenth Amendment. *Edelman* 415 U.S. at 672, 94 S.Ct. at 1360; *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 105 S.Ct. 3142, 3150, 87 L.Ed.2d 171 (1985).

■ Constructive consent to suit cannot be implied, and waiver of immunity can be found "only where stated 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.' " *Edelman* 415 U.S. at 673, 94 S.Ct. at 1361 (quoting *Murray v. Wilson Distilling Co.,* 213 U.S. 151, 171, 29 S.Ct. 458, 464, 53 L.Ed.2d 742 (1909)). Participation by the state in a public assistance program for which the federal government provides monetary assistance "is not sufficient to establish consent on the part of the State to be sued in the federal courts." *Edelman* 415 U.S. at 673, 94 S.Ct. at 1361. A state's waiver of sovereign immunity in its own courts is not a waiver of Eleventh Amendment immunity in federal courts. *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 99 fn. 9, 104 S.Ct. 900, 908 fn. 9, 79 L.Ed.2d 67 (1984).

■ Another exception is loosely called "abrogation." Congress may "abrogate" the Eleventh Amendment pursuant to its Fourteenth Amendment power to "enforce, by appropriate legislation, the provisions of this [Amendment]." U.S. Const. Amend. XIV § 5; *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). Such "abrogation" pursuant to the Fourteenth Amendment must be expressed "in unmistakable language in the statute itself." *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 105 S.Ct. 3142, 3148, 87 L.Ed.2d 171, (1985); *Welch v. State Dept. of Highways,* 483 U.S. ——, 107 S.Ct. 2941, 97 L.Ed.2d 389, 397–399 (1987). Abrogation cannot be inferred from general statutory language and statements in the legislative history. *Atascadero* 105 S.Ct. at 3147.

Application of this theoretical superstructure to a case requires particularized analysis of the prayer for relief. The complaint in this case seeks the following relief:

1. a preliminary injunction requiring the state to issue AFDC benefits to those who would qualify but for the policy of refusing recognition to tribal adoption orders;

2. a judgment declaring this policy to be unlawful;

3. a permanent injunction against "refusing to issue amended birth certificates or otherwise discriminating against tribal entities or individuals on the grounds that validly promulgated tribal adoption orders are not recognized by defendants" and requiring issuance of "amended birth certificates to plaintiffs Joseph and Solomon based upon the adoption orders of the respective Tribal Courts of the Native Village of Venetie and the Native Village of Fort Yukon."

4. costs, reasonable attorneys' fees, and such other relief as this court deems just and equitable.

This court has previously denied plaintiffs' motion for a preliminary injunction, so that prayer is no longer at issue. The State's Eleventh Amendment defense goes to the second and third prayers for relief. No decision need be made at this stage of the litigation regarding the attorneys' fees sought in the fourth prayer, since this claim becomes ripe only if plaintiffs prevail, and then may be analyzed under *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978).

■ Under *Edelman* and *Green*, discussed above, the Eleventh Amendment prevents this court from issuing a declaratory judgment that the State of Alaska has in the past wrongfully denied welfare benefits to plaintiffs. Such a declaratory judgment would amount to a retrospective award, because of its res judicata effect in a subsequent action in state court for damages. Defendant's motion for summary judgment must be granted in part as to the second prayer, and plaintiffs' motion denied. Likewise no ancillary equitable relief under the fourth prayer can be granted which amounts to a retrospective charge to the state treasury. Defendants are entitled to summary judgment regarding any such ancillary relief.

■ Plaintiffs would have the court read *Moe v. Confederated Salish and Kootenai Tribes*, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976) to mean that Congress abrogated the Eleventh Amendment by enacting 28 U.S.C. § 1362, the statute conferring jurisdiction on the district courts for federal question cases brought by Indian tribes or bands. *Moe*, however, focuses on a different jurisdictional problem, and does not discuss the Eleventh Amendment. Indian tribes on reservations sued for declaratory and injunctive relief against application of state cigarette taxes and vendor licensing statutes on the reservation. The State's defense, and the Supreme Court decision, focused on 28 U.S.C. § 1341, limiting federal jurisdiction to enjoin collection of state taxes, not the Eleventh Amendment. Construing 28 U.S.C. § 1341 and § 1362, not the Eleventh Amendment, the Supreme Court commented that the history of 28 U.S.C. § 1362 manifested "a Congressional purpose to open the federal courts to the kind of claims that could have been brought by the United States as trustee [for the tribe]. . . ." *Id.* at 472, 96 S.Ct. at 1641. The Court said:

While this [remark in the legislative history] is hardly an unequivocal statement of intent to allow such litigation to proceed irrespective of other explicit jurisdictional limitations, such as § 1341, it would appear that Congress contemplated that a tribe's access to federal court to litigate a matter "arising under the Constitution, laws or treaties" would be at least in some respects as broad as that of the United States suing as the tribe's trustee. *Id.* at 473, 96 S.Ct. at 1641

*Moe* does not hold, state as dictum, or even imply, that § 1362 "abrogates" the Eleventh Amendment. It holds only that § 1362 and § 1341 are reconciled by treating Indian tribes on reservations as excepted from § 1341.

As explained above, Congress may in a sense "abrogate" the Eleventh Amendment pursuant to its power to enforce the Fourteenth Amendment. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). However, while plaintiffs in the case at bar speak loosely of Congress "abrogating" the Eleventh Amendment by enacting 28 U.S.C. § 1362, Congress can never truly abrogate any part of the Constitution, for the Constitution limits the powers of Congress as well as those of other insti-

tutions. The doctrine of "abrogation" has developed to reconcile the limitation on federal power in the Eleventh Amendment with the subsequent expansion in the Civil War Amendments. Congress "abrogates" nothing, in the dictionary sense of annulling by an authoritative act, since it cannot repeal a part of the Constitution. Instead it reconciles the Eleventh and Fourteenth Amendments, in *Fitzpatrick* cases, by expressing in "unmistakable language in the statute itself" when it is acting pursuant to its Fourteenth Amendment power to "enforce, by appropriate legislation, the provisions of this article."

This explanation is not entirely consistent with the metaphysics of *Ex parte Young,* 209 U.S. 123, 150, 159, 28 S.Ct. 441, 450, 453, 52 L.Ed. 714 (1908). That decision implicitly treats the state official's action as state action for purposes of the Fourteenth but not the Eleventh Amendment. This explanation appears to be compelled, however, by the analysis in *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976), that the Eleventh Amendment is "necessarily limited" by the Fourteenth. The Supreme Court's use of the word "abrogate" in the context of the Eleventh Amendment means that Congress clearly expresses its intention to act pursuant to another portion of the Constitution which enables it to subject the states to federal judicial power.

The statute plaintiffs rely upon to "abrogate" the Eleventh Amendment, 28 U.S.C. § 1362, provides as follows:

The district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States.

This statute contains no "unmistakable language in the statute itself" purporting to subject state governments to lawsuits in federal courts, nor to act under a part of the Constitution empowering Congress to make an exception to the states' Eleventh Amendment immunity. The general reference to "all civil actions" is exactly the kind of language which under *Atascadero* and *Welch* cannot amount to abrogation. The remark in the legislative history characterized by *Moe* as "hardly ... unequivocal" cannot under *Atascadero* allow plaintiffs to avoid the Eleventh Amendment immunity. The statute therefore does not "abrogate" the Eleventh Amendment.

A lurking issue is whether Congress has the power to abrogate the Eleventh Amendment pursuant to its power under Article I, section 8 of the Constitution, "to regulate Commerce ... with the Indian Tribes." The problem is that the Eleventh Amendment became part of the Constitution later, and may limit Article I. Congressional power under Article I is not so clear as in the case of the Fourteenth Amendment, which came after the Eleventh Amendment, and was designed to expand federal power. This issue need not be reached in the case at bar, because the statute does not by its terms purport to abrogate the Eleventh Amendment.

Another issue not reached is whether the I.R.A. Councils acting as plaintiffs in this case are Indian tribes or bands for purposes of 28 U.S.C. § 1362. The Eleventh Amendment immunity bars the claim whether they are or not, so the question need not be answered in this case.

■ The discussion above bears only upon retrospective relief. Under *Ex parte Young,* the Eleventh Amendment does not bar an injunction requiring the state to obey federal law at variance with state law or policy. The third prayer therefore survives the State's Eleventh Amendment challenge, and must be treated on the merits. Prospective injunctive relief is available to compel state officials to obey controlling federal statutes. *Edelman v. Jordan,* 415 U.S. 651, 677, 94 S.Ct. 1347, 1362, 39 L.Ed.2d 662 (1974); *San Francisco Co. Dem. Cent. Comm. v. Eu,* 826 F.2d 814 (9th Cir.1987).

This distinction between damages immunity for state governments and exposure to injunctions has important unintended consequences. Except in cases involving a very great deal of money, a state may be

more impaired in its exercise of sovereignty by federal court injunctions entangling its future conduct in judicial supervision, than by damage awards which can be disposed of by writing a check. Since money judgments cannot be obtained, the distinction probably shifts much of the responsibility for obtaining state compliance with federal law from the private bar to the "public interest" bar, engendering complex procedural problems of standing, class actions, and broad prayers for relief.

The non-literal reading of the words of the Amendment by the courts adds mystery. If the point of the Amendment were to preserve the states as sovereigns free from federal judicial interference, why ignore the phrase "or equity" in the Amendment, which would seem to bar suits for injunctive relief? If private remedies are needed to effectuate the Fourteenth Amendment, why not read the "Citizens of another State" language to mean that the Amendment permits suits in law or equity by citizens of the same state, but not citizens of another state?

Eleventh Amendment jurisprudence exemplifies Holmes' proposition that "a page of history is worth a volume of logic." *New York Trust Co. v. Eisner,* 256 U.S. 345, 349, 41 S.Ct. 506, 507, 65 L.Ed. 963 (1921). C. Wright, Federal Courts 292 (4th ed. 1983). The justification for the distinction drawn in the cases may lie buried in the presumption against implicit repeal. Article VI, providing that the United States Constitution, laws and treaties "shall be the supreme Law of the Land" might be implicitly repealed, if the Eleventh Amendment were construed to bar injunctions against state governments violating federal law. Although the Eleventh Amendment does not bar actions by the United States against the states in federal court, administrative burdens of the executive branch and political inhibitions may sometimes have the same effect, so effective vindication of federally protected rights may require private actions. Perhaps the Union can survive occasional unjust denials of damage awards, pursuant to the bar on retroactive monetary relief, but cannot survive continuing, intentional violations of federal law by the states.

In any event, whether it makes sense or not, the distinction is imposed by higher courts than this one. This court has jurisdiction to enjoin state officials from violating federal law, but lacks jurisdiction to issue a money judgment or declaratory judgment regarding past conduct against the State of Alaska in this case.

None of the analysis above is intended to suggest that Alaska has deprived the plaintiffs of any rights they may have. Where the Eleventh Amendment bars a remedy, no such analysis is needed. Regarding the prayer for injunctive relief, the analysis of substantive rights may now begin.

## THE INDIAN CHILD WELFARE ACT

The Indian Child Welfare Act of 1978, 28 U.S.C. §§ 1901–1923, establishes a comprehensive scheme for transferring authority over adoptions and other judicial proceedings affecting Indian children from state courts to tribal courts.[1] The statute, with an exception critical to the case at bar, takes jurisdiction away from state courts for custody proceedings involving Indian children, and gives exclusive jurisdiction to Indian tribes. 25 U.S.C. § 1911(a). State courts are required by the statute to give full faith and credit to Indian tribal court decrees. 25 U.S.C. § 1911(d). Adoptions are covered by the statute. 25 U.S.C. § 1903(1)(iv). Numerous procedural devices, including notice to the child's tribe and appointment of counsel at public expense, assure invocation of the Act. 25

---

1. No Constitutional challenge to the Act has been asserted by the State, so this decision does not imply any judgment as to the concerns raised by the Justice Department during consideration of the legislation. The Department of Justice in letters in February and May of 1978, took the position that the bill might constitute unconstitutional racial discrimination against Indians not members of tribes, by depriving them of access to state courts based on their race rather than tribal membership, and might violate the Tenth Amendment by interfering with state authority over off-reservation Indians. 1978 U.S.Code Cong. & Admin.News 7530, 7558–7564.

U.S.C. § 1912. Where jurisdiction remains in state courts, those courts are required to apply certain principles of preference for Indian custody, regardless of whether these contradict state principles such as "best interests of the child." 25 U.S.C. § 1915.

This case turns on an exception in the ICWA grant of jurisdiction to tribal courts. The exception says, "except where such jurisdiction is otherwise vested in the State by existing federal law." 25 U.S.C. § 1911(a). This exception applies to what are called "Public Law 280 states." That law, codified as 28 U.S.C. § 1360(a), is an "existing federal law," and pursuant to it "jurisdiction is otherwise vested in the State." As stated above, plaintiffs now concede that the ICWA grant of exclusive jurisdiction does not apply to them because of the P.L. 280 exception, but argue that the tribal courts nevertheless retain a residue of concurrent jurisdiction, not abolished by P.L. 280, because of "tribal sovereignty," so that the tribal court decrees are entitled to full faith and credit under ICWA.

To understand the relationship between ICWA and P.L. 280, one needs a general understanding of certain established Indian law doctrines. The doctrines have reflected fluctations in federal Indian policy between separatism and assimilation, so a minimum of historical understanding is needed to comprehend the theoretical scheme. The relationship of history and doctrine is especially complex in Alaska, because the historical and statutory relationship of Alaska Natives with the state and federal government is unique.

The analysis in this decision does not require determination of the scope of "Indian country." The statutory analysis herein applies regardless of whether Fort Yukon and Venetie are Indian country, so that issue has not been determined, explicitly or implicitly, in this decision.

## I. The concept of "tribal sovereignty."

King George III created "Indian Country" in America by the Proclamation of 1763. The British policy, developed in reaction to the Indians' siding with the French during the French and Indian War, was to create a boundary between the white populations under civilian colonial administration, and Indian lands under military authority. F. Prucha, American Indian Policy in the Formative Years 11–14, 20 (1962). After the Revolution, the Continental Congress adopted language in 1777, effective in 1781, for the Articles of Confederation partly carrying over the British scheme of centralized management:

> The United States in Congress assembled shall also have the sole and exclusive right and power of ... regulating the trade and managing all affairs with the Indians, not members of any of the states, provided that the legislative right of any State within its own limits be not infringed or violated.

Art. IX, Articles of Confederation; Prucha at 29–30.

The Constitution further nationalized power over Indian affairs, by removing the two qualifications in the Articles of Confederation, and providing that "The Congress shall have Power ... To regulate Commerce ... with the Indian Tribes...." U.S. Const., Article I, § 8. Madison had criticized the Articles on the grounds that the phrase "not members of any states" had no clear meaning, and that regulation of "trade with Indians" by the national government without intruding on states' rights to legislate was "absolutely incomprehensible." *The Federalist* No. 42. Power over Indian affairs is nationalized also by the treaty provisions of the Constitution. Treaties made by the national government are binding upon the states under the Supremacy Clause of Article VI, and states are prohibited from entering into treaties by Article I § 10.

From the colonists' viewpoint, a fundamental problem of Indian policy was regulation and legitimization of acquisition of land. In 1783, shortly after the Revolutionary War ended, the policy was developed of treating the Indians as conquered nations, since many tribes had sided with the English, and taking their lands by right of conquest. F. Prucha, *supra,* at 32. Peace

on the western frontier was threatened,. however, by British and Indian objection to this policy, and by state incursions on Indian country. Some state incursions were accomplished through treaties between the individual states and Indian tribes, in which groups of Indians executed land concessions purporting to bind their entire tribes. *Id.* at 34–37.

Treaties entered into by the national government best minimized diplomatic difficulties with the British and war with the Indians. The treaty method of acquiring title to Indian lands required some doctrinal underpinning if the British were to accept the treaties as binding upon the tribes, and not just the individual Indians executing them. The treaties rested upon the doctrine that "the Indian tribes were independent nations with their own rights and sovereignty, rather than subjects of the colony or nation in whose territory they resided." *Id.* at 142 The treaty approach maintained the federal monopoly on agreements with Indian tribes, since federal treaties bind the states, and states are prohibited from making treaties.

 The validity of a treaty depends upon the existence of a sovereign entity recognized in international law with which to make the treaty. von Schussnigg, International Law 261 (1959); 45 Am.Jur.2d *International Law* § 38 (1969). Some aspect of sovereignty had to be recognized in the Indian tribes in order to legitimize acquisitions by agreements with small groups of people purporting to bind entire nations. Recognition of the tribes as sovereign entities accomplished this purpose. The doctrine that Indian tribes were in some respects sovereign entities also avoided the implication that Indians were to be considered citizens with the same rights as other citizens of the states and of the United States.

 "Tribal sovereignty" is a song with a cheerful tune disguising sad lyrics. To put it plainly, the doctrine was invented in large part to take the Indians' land.

Sovereignty for Indian tribes was a useful expedient when it became necessary for the colonists and their new government to anoint the tribes with a status sufficient for tribes to bargain away their rights to land by treaty. D. Getches and C. Wilkinson, Federal Indian Law—Cases and Materials 269 (2d ed. 1986).

Because it shifts certain powers to Indian tribes from state governments, some now see it as a weapon that can function for Indian defense. The weapon cannot be used to defend Indians against the plenary power of the federal government, however, so it can leave Indians at the mercy of lower level government administrators. The weapon is dangerous to Indians, because it deprives Indians subject to tribal governments of the protection of the United States Constitution. Because the use of the "tribal sovereignty" doctrine is so dangerous, courts must be chary of loose application.

*Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1831) begins the critical line of authorities. The Cherokees sued for an injunction to restrain the State of Georgia from enforcing its laws within the Cherokee Nation. Chief Justice John Marshall characterized the Indian tribes as "domestic dependent nations," *id.* at 17, as distinct from foreign states. The context of this phrase was his opinion on the jurisdictional question of whether the federal judicial power over cases "between a State ... and foreign States," U.S. Const., Art. III § 2, conferred jurisdiction on the federal judiciary. Since the Indian tribes were not "foreign states," the court lacked jurisdiction; that is, the Indian tribes could not sue the State of Georgia in federal court. *Cherokee Nation* plainly distinguished tribal sovereignty from the sovereignty of a foreign state. A foreign state could sue a state of the United States in federal court, but an Indian tribe was denied access.

The peculiar and limited sovereignty of the Indian tribes was further elucidated by the Supreme Court in *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832). A Georgia statute prohibited white males from residing in the Cherokee Indian Nation without a license from the governor. The State of Georgia convicted and sen-

tenced a missionary to four years hard labor, for residing on the Cherokee reservation without a license. The missionary, Worcester, admitted that he lived on the reservation, where he preached and translated the Bible into the Cherokee language, but denied that Georgia had jurisdiction over the reservation under the treaties between the Cherokee nation and the United States, and claimed that the Georgia statute was an unconstitutional interference with the exclusive power of the federal government to regulate commerce with the Indian tribes.

Chief Justice Marshall doubted that discovery could confer rights to land upon the discoverers as against the aboriginal population, but found that "power, war, conquest, give rights," as did purchase. *Worcester,* 31 U.S. at 543, 546. The Cherokees had sided with the British in the Revolution. The peace treaty with the Cherokee nation "receive[d] them into the favour and protection of the United States of America" and "under the protection of the United States of America, and of no other power." *Id.* at 550–551. The treaties with the Cherokees recognized extensive rights of self-government by the tribe. *Id.* at 549–556.

The Court explains that "[t]he treaties and laws of the United States contemplate the Indian territory as completely separated from that of the states; and provide that all intercourse with them shall be carried on exclusively by the government of the Union." *Id.* at 557. Within this territory, the "Indian nations had always been considered as distinct, independent political communities, retaining their original natural rights, as the undisputed possessors of the soil, from time immemorial, with the single exception of that imposed by irresistible power...." *Id.* at 559. The Cherokee nation was "a distinct community, occupying its own territory, with boundaries accurately described, in which the laws of Georgia can have no force." *Id.* at 560. The state law under which Worcester was con-

victed was therefore void as against the exclusive grant of power in the Constitution to the national government to regulate commerce with the Indians, and the supremacy of treaties over state laws.

From these two cases and their progeny comes the doctrine of tribal sovereignty. The leading scholar of Indian law, Felix Cohen, set it out in these words:

> [T]hose powers which are lawfully vested in an Indian tribe are not, in general, delegated powers granted by express acts of Congress, but rather inherent powers of a limited sovereignty which has never been extinguished. Each Indian tribe begins its relationship with the Federal Government as a sovereign power, recognized as such in treaty and legislation. The powers of sovereignty have been limited from time to time by special treaties and laws designed to take from the Indian tribes control of matters which, in the judgment of Congress, these tribes could no longer be safely permitted to handle. The statutes of Congress, then, must be examined to determine the limitations of tribal sovereignty rather than to determine its sources or its positive content. What is not expressly limited remains within the domain of tribal sovereignty. F. Cohen, Handbook of Federal Indian Law 122 (U.New Mexico reprint of 1942 ed.) (emphasis in original).[2]

As Cohen's formulation implies, the doctrine of tribal sovereignty gives the Indian tribes no rights whatsoever as against the federal government. One consequence of the doctrine of tribal sovereignty is to strip individual Indians of some rights of ordinary citizens as against the federal government, and to treat them in some respects like children and in others as subjects of a foreign power not bound by American law:

> They were nevertheless to be subject to the laws of the United States, not in the sense of citizens, but, as they had always

---

**2.** Cohen's original edition is used here. Subsequent editions in 1958 and 1982, the first during an assimilationist period, the second during a separatist period, were called Cohen, but gave the prestige of his name to other scholars' words. The use of the first edition here represents no ideological choice, but rather a desire to use Cohen's words when citing to Cohen, for the sake of authenticity.

been, as wards subject to a guardian; not as individuals, constituted members of the political community of the United States, with a voice in the selection of representatives and the framing of the laws, but as a dependent community who were in a state of pupilage.... *Ex parte Crow Dog,* 109 U.S. 556, 569, 3 S.Ct. 396, 404, 27 L.Ed. 1030 (1883).

*Ex parte Crow Dog* had left it to tribal law to punish murder of an Indian by an Indian on a reservation. Congress responded by passing the Major Crimes Act, making certain inter-Indian conduct on reservations federal crimes. Had the doctrine of tribal sovereignty connoted any right of tribal self-government as against the federal government, the statute would have been unconstitutional, as going beyond the power of Congress to pass laws regulating "commerce ... with the Indian tribes."

If the doctrine of tribal sovereignty ever reserved any powers to Indian tribes against the federal government, perhaps in the interstices not covered by the Indian commerce clause, any such powers evaporated more than a century ago. The Supreme Court excluded Indian tribes from the "broad domain of sovereignty" in *United ed States v. Kagama,* 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886).

> But these Indians are within the geographical limits of the United States. The soil and the people within these limits are under the political control of the Government of the United States, or of the States of the Union. There exist within the broad domain of sovereignty but these two.

The Court determined that Indian nations were not analogous to foreign nations, nor were they domestic nations with sovereignty like that of foreign nations. *Id.* at 379, 6 S.Ct. at 1111. *Kagama* holds that the federal government has plenary power not limited to regulation of commerce with the Indian tribes. The Court reasoned that since the Indian tribes are within the geographical boundaries of the United States, of necessity federal power must be available to protect the Indians and the "safety of those among whom they dwell." 118 U.S. at 384, 6 S.Ct. at 1114. Under *Kaga-*

*ma,* such sovereignty as the Indian tribes have is limited to "regulating their internal and social relations." 118 U.S. at 382, 6 S.Ct. at 1113.

As its origins make clear, the phrase "tribal sovereignty," although it connotes supreme political authority in ordinary English, means much less than that when used as a legal term of art. Tribal sovereignty, such as it is, generally does not extend outside of "Indian country" or beyond relations among Indians and to some extent between Indians and non-Indians who avail themselves of transactions with Indians in "Indian country." Within those limits, tribal authority is but the residue of authority not allocated elsewhere by Congress.

> Thus, in addition to the power to punish tribal offenders, the Indian tribes retain their inherent power to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members.... But exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation.

*Montana v. United States,* 450 U.S. 544, 564, 101 S.Ct. 1245, 1258, 67 L.Ed.2d 493 (1981).

Congress has plenary power, often exercised, to take power away from Indian tribes in Indian country. Tribal sovereignty "exists only at the sufferance of Congress and is subject to complete defeasance." *United States v. Wheeler,* 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed. 2d 303 (1978). To the extent that Congress has not qualified or removed it, this limited power of tribes in Indian country need not be based upon an explicit grant of authority. Some independence from state law, but not federal law, is allowed by Congress to Indian tribes in Indian country, but because they are "domestic dependent nations," they have no "sovereignty" comparable to a foreign state, and no authority as against Congress. These principles of law limiting the meaning of "tribal sovereign-

ty" are old, well established, and reaffirmed by the United States Supreme Court in the *Wheeler* decision in 1978.

## II. Protection of Civil liberties in Indian country.

Though limited, tribal sovereignty is by no means trivial. Denomination of territory as "Indian country" and of a group of Indians there as a "tribe" confers power on the leaders of such a community, and deprives the members of the tribe of much of the protection of the United States Constitution.

 As against Congress, tribal sovereignty is but a stick in front of a tank; but to the individual Indian, and in some circumstances to outsiders, the wielder of the stick may be more powerful than any state or federal official. The Constitution of the United States restrains state and federal officials, but not tribal officials acting on behalf of a tribe in "Indian country." Since Constitutional safeguards do not apply, tribal sovereignty could be used in custody proceedings to deprive children or parents of fundamental rights without notice or a hearing, to foster an established religion within Indian country, or in other surprising ways, in the absence of statutory and administrative restraints. The United States Supreme Court has repeatedly affirmed that the Constitution does not restrain the exercise of tribal sovereignty in Indian country, and Congress has repeatedly exercised its plenary power to substitute statutory and administrative restraints.

The Supreme Court held in *Talton v. Mayes*, 163 U.S. 376, 384, 16 S.Ct. 986, 989, 41 L.Ed. 196 (1896), that since Cherokee tribal powers "existed prior to the Constitution, they are not operated upon by the Fifth Amendment...." *Talton v. Mayes* was reaffirmed in *United States v. Wheeler*, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978). The Supreme Court in *Wheeler* held that an Indian tribe was a separate sovereign for purposes of the Double Jeopardy Clause, so an Indian could be prosecuted in federal court for rape even though he had already pled guilty to charges of disorderly conduct and contributing to the delinquency of a minor in tribal court arising out of the same incident. Since Indian tribes "are not the federal government nor are they states or subdivisions of either, [i]t is therefore normally not possible for any person, Indian or non-Indian, to invoke the Bill of Rights or the Fourteenth Amendment against a tribe." W. Canby, American Indian Law In A Nutshell 207 (1981).

Congress perceived that "rights, fundamental to our system of constitutional freedoms, are not now secured by laws respecting the American Indian," 1968 U.S.Code Cong. & Admin.News 1837, 1867. In response to "[i]investigations [showing] that tribal members' basic constitutional rights have been denied at every level," *id.* at 1864, Congress passed the Indian Civil Rights Act. That Act imposes some but not all Bill of Rights protections on Indian tribes. 25 U.S.C. § 1302. Notable by their absence are the Establishment Clause, the right to jury trial in civil cases, and the right of indigents to appointed counsel in criminal cases.

 Remedies under the Indian Civil Rights Act are severely limited by the holding in *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978). *Santa Clara Pueblo* holds that neither declaratory nor injunctive relief can be sought in federal court to enforce the Act. The only remedy available in federal court is the writ of habeas corpus, to test legality of detention by order of a tribal court, because "suits against the tribe under the ICRA are barred by its sovereign immunity from suit." 436 U.S. at 59, 98 S.Ct. at 1677.

As a result of *Santa Clara Pueblo*, persons whose children are taken without due process, or whose free exercise of religion is impaired, or who otherwise suffer deprivation of rights not resulting in detention, may altogether lack remedies outside tribal forums. The Indian Civil Rights Act offers little assistance outside tribal forums except where a claim can be cast as a petition for a writ of habeas corpus.

A substantial body of scholarly literature sugests that many tribal courts experience structural difficulties, including "tribal leaders putting pressure upon an Indian court judge to rule a certain way," lack of appellate tribunals, difficulty of obtaining adequately trained judges, and tribal officials' disobedience of judgments. National American Indian Court Judges Assn., Indian Courts and the Future, quoted in D. Getches & C. Wilkinson, Federal Indian Law 384–392 (1986); see also S. Brakel, American Indian Tribal Courts (1978).

Because the Constitution generally does not protect the civil liberties of native parents and children against tribal courts, it is likely that Congress intended such statutory safeguards as it imposed in the Indian Child Welfare Act to be mandatory. Where the statute provides a means for reassumption of tribal court jurisdiction in Public Law 280 states, subject to Interior Department approval, Congress probably intended this to be the exclusive path to tribal court jurisdiction. Otherwise the statutory policies, "to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families," 25 U.S.C. § 1902, could be subverted by the statute adopted to advance them.

## III. Unique factors in Alaska.

The law of aboriginal peoples in Alaska has remained distinct from Indian law for the continental United States, because of the different historical path taken in Alaska. Indian law treatises and casebooks typically have separate chapters on Alaska Natives because the historical and legal distinctions are so substantial. See, e.g., Strickland et. al., Felix S. Cohen's Handbook of Federal Indian Law 739–770 (1982). Alaska Natives have not entered into treaties with the United States, so the original function of the doctrine of "tribal sovereignty," to legitimize treaties ceding Indian land, had no application to Alaska.

A century ago, the United States District Court distinguished Alaska from other jurisdictions. The court in In re Sah Quah, 31 F. 327 (D.Alaska 1886) holds that the Thirteenth Amendment, prohibiting slavery, applies to Indian groups in Alaska. It is not clear whether the decision implies universal applicability of the Thirteenth Amendment to Indian tribes, since the court took pains to distinguish the circumstances of Alaska Natives. The court found that among the Tlingit Indians, "the attributes of their original sovereignty have been lost," 31 F. at 328, their system of government was "essentially patriarchal, and not tribal," 31 F. at 329, and the United States had always dealt with them as "dependent subjects," and had never recognized any "tribal independence." 31 F. at 329.

Since Sah Quah, Alaska has been partially assimilated to the national body of Indian law. F. Cohen, Federal Indian Law 404 (1942). Nevertheless, many quite distinct features remain, distinguishing the situation of Alaska Natives from that of Indians in the continental United States. Alaska has only one Indian reservation, and most Alaska Natives do not live on reservations.

The Alaska Native Claims Settlement Act, 43 U.S.C. § 1601 et seq., created a unique corporate framework for Alaskan Indians, Eskimos, and Aleuts, differentiating them from all other Indians in the United States. The Act conferred great financial benefits upon the Native corporations established to carry it out, but also provided that "[a]ll aboriginal titles, if any ... are hereby extinguished." 43 U.S.C. § 1603(b). Congress declared that "the settlement should be accomplished ... without establishing any permanent racially defined institutions, rights, privileges, or obligations, without creating a reservation system or lengthy wardship or trusteeship...." 43 U.S.C. § 1601(b).

The logic of the statutory analysis below would not distinguish Alaska from other Public Law 280 states under the Indian Child Welfare Act. The uniqueness of the Alaska historical and statutory context nevertheless needs to be mentioned, because it may be that some other court will recognize a factor overlooked here, requir-

ing a distinction between Alaska and other states.

## IV. The relationship of ICWA with P.L. 280.

The Indian Child Welfare Act (ICWA) provides for exclusive jurisdiction of custody proceedings involving reservation Indian children in tribal courts, not state courts. This provision is subject to an exception where existing federal (not state) law vests jurisdiction in state courts:

> An Indian tribe shall have jurisdiction exclusive as to any State over any child custody proceeding involving an Indian child who resides or is domiciled within the reservation of such tribe, except where such jurisdiction is otherwise vested in the State by existing Federal law.

25 U.S.C. § 1911(a).

Several of the terms used in the Act have broader meanings than in ordinary English. The term "child custody proceeding" includes adoption. 25 U.S.C. § 1903(1)(iv). The term "Indian tribe" includes "any Alaska Native village as defined in section [3(c) of ANCSA]." 25 U.S.C. § 1903(8). The term "reservation" means "Indian country as defined in section 1151 of Title 18" and additional lands held in trust by the United States or held by tribes or Indian individuals subject to restrictions on alienation. 25 U.S.C. § 1903(10).

In state court proceedings to terminate parental rights or for foster care of non-reservation Indian children, the state courts are required in certain circumstances to transfer jurisdiction to tribal courts. 25 U.S.C. § 1911(b). States are in general required to give full faith and credit to tribal court decrees:

> [E]very State ... shall give full faith and credit to the public acts, records, and judicial proceedings of any Indian tribe applicable to Indian child custody proceedings to the same extent that such entities give full faith and credit to the public acts, records and judicial proceedings of any other entity.

25 U.S.C. § 1911(d).

The case at bar arises from the frustrated attempts of the two individual plaintiffs to collect Aid to Families with Dependent Children for the children they have adopted in the Venetie and Fort Yukon tribal courts. The Social Security regulations require that for AFDC to be payable, the child must reside with a relative, including a "person who legally adopt [sic] a child ... and other relatives of the adoptive parents in accordance with State law...." 45 C.F.R. § 233.90(c)(1)(v)(A)(3). In the case at bar, the State of Alaska has refused to issue birth certificates in the names of the adoptive parents, as it does for children adopted in Alaska courts pursuant to AS 25.23.170. Plaintiffs claim that this amounts to an unlawful refusal to give full faith and credit to the tribal court decrees, and unlawfully deprives them of AFDC payments.

The State argues that ICWA does not confer tribal court jurisdiction in this case, because Alaska is a "P.L. 280 state." This argument turns on the phrase in the grant of exclusive jurisdiction to tribal courts which excludes those instances in which "such jurisdiction is otherwise vested in the State by existing Federal law." 25 U.S.C. § 1911(a).

An "existing federal law" provides that Alaska and five other states have "jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country listed...." 28 U.S.C. § 1360(a). Adoption cases are "civil causes of action" in the sense of this statute. The state courts in such cases are required to give "full force and effect" only to certain tribal ordinances and customs not inconsistent with state law. 28 U.S.C. § 1360(c). That statute was enacted in 1953, as Public Law 280. 67 Stat. 588. Alaska was added to the list of "P.L. 280 states" in 1958. P.L. 85–615, 72 Stat. 545.

The statute sought to treat Indians in the affected states more like everyone else in those states:

> This legislation ... has two coordinate aims: First, withdrawal of Federal responsibility for Indian affairs wherever practicable; and second, termination of

the subjection of Indians to Federal laws applicable to Indians as such.

1953 U.S.Code Cong. & Admin.News 2409. Congress sought to make Indians "truly first-class citizen[s]," *id.* at 2411 by, among other things, placing them under the same ˙ɘgal regime as others:

> Similarly, the Indians of several States have reached a state of acculturation and development that makes desirable extension of State civil jurisdiction to the Indian country within their borders. Permitting the State courts to adjudicate civil controversies arising on Indian reservations, and to extend to those reservations the substantive civil laws of the respective States insofar as those laws are of general application to private persons or private property, is deemed desirable.

1953 U.S.Code Cong. & Admin.News 2412.

Congress added Alaska to the list of P.L. 280 states in order to overcome the consequences of two United States District Court decisions treating the native village of Tyonek as "Indian country"; the legal effect of "Indian country" treatment in those cases was to free two prisoners charged with statutory rape. 1958 U.S. Code Cong. & Adm. News 3347. Congress found that a large number of native villages in Alaska were similarly situated, lacked sufficient tribal means of maintaining law and order, and needed state services in this regard:

> Such a construction [treating Tyonek as Indian country] affects a large number of other native villages in Alaska similarly situated. The committee has been advised that these native villages do not have adequate machinery for enforcing law and order. They have no tribal court, no police, no criminal code, and in many instances no formal organization. This is for the reason that the Territorial government in Alaska has maintained law and order in the native villages as well as in the rest of Alaska and the native tribal councils have had no reason nor have they ever exercised these functions. Since the natives are not prepared to take over these activities, the recent

court decision has left the villages and the people without protection.

1958 U.S.Code Cong. & Admin. News 3347–3348. Since a federal law, Public Law 280, vests civil jurisdiction in the state, and the ICWA grant of exclusive jurisdiction to tribal courts says "except where such jurisdiction is otherwise vested in the State by existing Federal law," 25 U.S.C. § 1911(a), the proposition is inescapable that the exclusive jurisdiction provision does not apply.

V. Reassumption of Jurisdiction.

Congress crafted an elaborate scheme for what it called "reassumption of jurisdiction" by tribal courts in P.L. 280 states, codified in ICWA at 25 U.S.C. § 1918. This scheme reconciles the purposes of ICWA with the purposes of P.L. 280. In material part, the reassumption statute provides as follows:

> **(a) Petition; suitable plan; approval by Secretary**
>
> Any Indian tribe which became subject to State jurisdiction ... may reassume jurisdiction over child custody proceedings. Before any Indian tribe may reassume jurisdiction over Indian child custody proceedings, such tribe shall present to the Secretary for approval a petition to reassume such jurisdiction which includes a suitable plan to exercise such jurisdiction.
>
> **(b) Criteria applicable to consideration by Secretary; partial retrocession**
>
> (1) In considering the petition and feasibility of the plan of a tribe under subsection (a) of this section, the Secretary may consider, among other things:
>
> > (i) whether or not the tribe maintains a membership roll or alternative provision for clearly identifying the persons who will be affected by the reassumption of jurisdiction by the tribe;
> >
> > (ii) the size of the reservation or former reservation area which will be affected by retrocession and reassumption of jurisdiction by the tribe;
> >
> > (iii) the population base of the tribe, or distribution of the population in homogeneous communities or geographic areas; and

(iv) the feasibility of the plan in cases of multitribal occupation of a single reservation or geographic area.

(2) In those cases where the Secretary determines that the jurisdictional provisions of section 1911(a) of this title are not feasible, he is authorized to accept partial retrocession which will enable the tribes to exercise referral jurisdiction as provided in section 1911(b) of this title, or, where appropriate, will allow them to exercise exclusive jurisdiction as provided in section 1911(a) of this title over limited community or geographic areas without regard for the reservation status of the area affected.

**(c) Approval of petition; publication in Federal Register; notice; reassumption period; correction of causes for disapproval**

If the Secretary approves any petition under subsection (a) of this section, the Secretary shall publish notice of such approval in the Federal Register and shall notify the affected State or States of such approval. The Indian tribe concerned shall reassume jurisdiction sixty days after publication in the Federal Register of notice of approval. If the Secretary disapproves any petition under subsection (a) of this section, the Secretary shall provide such technical assistance as may be necessary to enable the tribe to correct any deficiency which the Secretary identified as a cause for disapproval.

25 U.S.C. § 1918.

The Department of Interior has issued regulations elaborating the procedure by which tribes in P.L. 280 states "may reassume jurisdiction over Indian child custody proceedings." 25 C.F.R. § 13.1(a). The regulations explicitly provide that a tribe may reassume jurisdiction without waiving its claim that it never lost it:

On some reservations there are disputes concerning whether certain federal statutes have subjected Indian child custody proceedings to state jurisdiction or whether any such jurisdiction conferred on a state is exclusive of tribal jurisdiction. Tribes located on those reserva-

tions may wish to exercise ... jurisdiction currently exercised by the state without the necessity of engaging in protracted litigation. The procedures in this part also permit such tribes to secure unquestioned exclusive, concurrent or partial jurisdiction over Indian child custody matters without relinquishing their claim that no Federal statute had ever deprived them of that jurisdiction.

25 C.F.R. § 13.1(b).

■ In the case at bar, the plaintiff villages have not used the reassumption procedure. They have chosen the path of "protracted litigation," putting their claims to the test. They claim that the reassumption provisions have no application, because their tribal court powers were never lost. They argue that the reassumption procedures need only be followed to obtain exclusive jurisdiction, not concurrent jurisdiction. They would have both the state courts and the tribal courts exercise jurisdiction, with the state to give full faith and credit to tribal court decrees. These claims cannot be reconciled with the statute.

The regulations set forth in considerable detail what must be contained in a reassumption petition, in accord with the statute. 25 C.F.R. § 13.11(a). Among the requirements are a resolution by the tribal governing body supporting the plan, 25 C.F.R. § 13.11(a)(2), "[c]itation to provision in tribal constitution ... that authorizes the tribal governing body to exercise jurisdiction over Indian child custody matters," 25 C.F.R. § 13.11(a)(7), description of the tribal court, 25 C.F.R. § 13.11(a)(8), and copies of applicable tribal ordinances or tribal court rules establishing procedures, 25 C.F.R. § 13.11(a)(9), and "[c]lear and definite description of the territory over which jurisdiction will be reassumed." 25 C.F.R. § 13.11(b)(2).

These requirements protect against the risk, among others, of some self-appointed group without tribal authority purporting to act as a court without any authority, rules, or territorial limits. The Department of the Interior has expressed concern about this problem:

Exercise of jurisdiction by an entity not authorized to exercise it would constitute a violation of the right to due process. ... If the tribal electorate wishes its governing body to exercise such authority despite the Department's conclusion that its constitution or governing document does not authorize the governing body to do so, the constitution or governing document can be amended.

44 Fed.Reg. 45094.

The importance of the requirements in the reassumption regulations are highlighted by the factual circumstances of this case. The record allows the inference that the native people of Fort Yukon and Venetie never authorized the creation of tribal courts in their villages to adjudicate custody of their children.

The Constitution and By–Laws of the Native Village of Venetie and the Native Village of Fort Yukon were submitted with plaintiffs' motion for preliminary injunction. Neither explicitly authorizes creation of any tribal court. Neither specifies clear territorial limits. Both provide for establishment of a governing body shortly after adoption, which bodies apparently did not include tribal courts. Village of Venetie Const., art. III, § 1; Village of Fort Yukon Const., art. III, § 1.

Both constitutions require that amendments be approved by majorities of village members in elections called by the Secretary of the Interior in which at least 30% of village members vote. Village of Venetie Const., art. VI; Village of Fort Yukon Const., art. VI. The record gives no indication that any such amendments have been made.

Both constitutions empower the village "[t]o do all things for the common good which it has done or has had the right to do in the past and which are not against Federal law and such Territorial law as may apply," and [t]o guard and foster native life, arts and possessions and native customs not against law." Village of Venetie Const., art. IV, § 1; Village of Fort Yukon Const., art. IV, § 1. Compare the following language from the United States Constitution: "The judicial power of the United States shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const., art. III, § 1. It is not at all clear whether these village constitutions contemplate the establishment of courts. The reference to "things ... which it has done or has had the right to do in the past" could be enlightening, except that the villages have offered no evidence that they had courts adjudicating adoptions before or at the time their constitutions were adopted.

Both constitutions provide for the exercise of "such other powers as may be given to [the village] by the Federal or Territorial Government." Village of Venetie Const., art. IV, § 2; Village of Fort Yukon Const., art. IV, § 2. This provision may entitle the village governing bodies to establish courts to adjudicate adoptions, if the federal government pursuant to ICWA confers that power in accord with the reassumption provisions of ICWA and the regulations. This provision in the village constitutions, however, is inconsistent with plaintiffs' proposition that their power is a residue of those not taken away, and not dependent on reassumption under ICWA. Like most constitutions in free societies, these Indian constitutions limit governmental power, and limit the ways government can get more power.

This court was supplied with an uncertified copy of a resolution apparently passed by the Native Village of Fort Yukon Council to establish a tribal court. (App. 3, plaintiffs' motion for preliminary injunction). No similar document was offered by Venetie. The resolution was apparently passed in 1986, which implies that such a court has not existed since 1939, when the constitution became effective. The operative language of the resolution provides that "the court shall serve as the tribal court on all matters involving tribal ordinances, customs and traditions." This language does not demonstrate persuasively that the Village Council intended to empower the court to rule on adoptions, nor is there any indication of the composition,

procedure, and territorial jurisdiction of the court.

Among the criteria which the Secretary uses to evaluate reassumption petitions are conformity of tribal court procedures with the Indian Civil Rights Act.

(a) The Assistant Secretary—Indian Affairs shall approve a tribal petition to reassume jurisdiction over Indian child custody matters if:

. . . . .

(4) A tribal court ... has been established or will be established before reassumption and that tribal court will be able to exercise jurisdiction over Indian child custody matters in a manner that meets the requirements of the Indian Civil Rights Act, 25 U.S.C. 1302.

25 C.F.R. § 13.12(a). This criterion is critical because, as explained above, tribal courts are generally not bound by the United States Constitution, and under *Santa Clara Pueblo*, persons aggrieved by their actions generally have no remedy except challenges to their jurisdiction and habeas corpus petitions. A creative lawyer would be needed to turn an unfair contested adoption case into a habeas corpus petition, so that he could obtain a test in federal court of compliance by the tribal court with the Indian Civil Rights Act.

The Department of the Interior evaluated and rejected criticism of the Indian Civil Rights Act criterion:

In footnote 22 the Court in *Santa Clara Pueblo* specifically noted that it may be appropriate to consider Indian Civil Rights Act issues when the Department exercises its approval authority. The Department will not exercise its approval power in a manner that authorizes violations of civil rights. A plan that does not provide for exercise of jurisdiction in a manner that protects rights guaranteed under the Indian Civil Rights Act is not a feasible plan as required by the Indian Child Welfare Act.

44 Fed.Reg. 45094 (1979).

Publication by the Secretary in the Federal Register of his notice of approval must be accompanied by "a clear and definite description of the territory presently subject to the reassumption," and copies must be sent to the Governor, Attorney General, and highest court of the state. 25 C.F.R. § 13.14(b). This requirement facilitates the necessary adjustment by the state to tribal court jurisdiction.

Once a tribal court obtains exclusive, partial or concurrent jurisdiction under the reassumption provisions, the state government will, as a practical matter, have to bring its own apparatus into compliance. Social workers and assistant attorneys general who do child in need of aid cases will need to be told the date and territorial limits, so that they know which court to petition when they find a child in need. State courts will need some basis for resolving disputes as to which court has jurisdiction. In P.L. 280 states, the state government apparatus is accustomed to acting in these matters, and the ICWA statute may reasonably be construed to have intended that tribal court reassumption of jurisdiction be accompanied by such formalities, whether exclusive or concurrent.

The uncertainty which validation of plaintiffs' theory of residual concurrent jurisdiction would create makes it an unlikely Congressional objective. Social workers typically take physical custody of a child when they perceive an emergency, then petition a court on an emergency basis to extend custody. The procedure operates in a very short time frame. In Alaska, with its hundreds of native villages, conflicting decrees between village tribal courts, each with some claim to jurisdiction, would be likely under a doctrine of implied reserved concurrent jurisdiction. The locations of the natural mother, the child, the customary guardian, and the father might often be in two or more different villages. Conflicting claims to entitlements based on custody, such as AFDC, may often arise. These circumstances require clear rules, not leisurely analysis by judges and lawyers of the mysteries of choice of laws and concurrent jurisdiction doctrines. Congress is constitutionally empowered to make the law impractical, but a court should not

impose a strained, non-literal reading of the law to impose so impractical a result.

For these reasons, compliance with the reassumption procedure is necessary to assure protection of natives' civil liberties, and to assure practical management of the transition to tribal court jurisdiction by the state government. The statute and regulations cannot be reconciled with the plaintiffs' position, that the tribal courts of the Native Villages of Venetie and of Fort Yukon may exercise concurrent jurisdiction over adoptions despite their failure to comply in any manner with the reassumption provisions. Finally, the statutory language, "except where such jurisdiction is otherwise vested in the State by existing Federal law," 25 U.S.C. § 1911(a) plainly takes Alaska out of the ICWA exclusive jurisdiction statute, because P.L. 280 (28 U.S.C. § 1360(a)) gives the State of Alaska jurisdiction. Plaintiffs' position implicitly posits an exception to the express exception for P.L. 280 states. Neither the language nor the functions of the reassumption provisions justify that construction.

The State of Alaska has gone beyond the mimimum required by ICWA in granting to Indian villages a right to intervene in adoption proceedings regarding Indian children. The Alaska Supreme Court saw the tribe's interest as "often" differing from the child's best interests, so not adequately represented by the child's guardian ad litem. *In re J.R.S.*, 690 P.2d 10,19 (Alaska 1984).

Nevertheless, the Alaska Supreme Court has construed the reassumption provision of ICWA to the same effect as this decision. That Court decided in *Native Village of Nenana v. Alaska Dept. of Health and Social Services*, 722 P.2d 219 (Alaska 1986), *cert. den.* 479 U.S. 1008, 107 S.Ct. 649, 93 L.Ed.2d 704, that an Alaska native village, which had not obtained Interior Department approval for reassumption or partial retrocession, was not entitled to have a child in need of aid case involving an Indian child transferred from state court to tribal court. The case held that the tribal court had no jurisdiction, exclusive or con-

current, under ICWA, in the absence of reassumption or partial retrocession.

While a federal court must interpret a federal statute independently of a state court, the reasoning of the state court in *Native Village of Nenana* is noteworthy:

There are more than 200 such villages "listed...." Some of these entities already may have systems for dispute resolution in place capable of adjudicating custody matters in a reasonable and competent fashion; others, no doubt do not. It seems highly unlikely that Congress was unaware of this when it enacted the Indian Child Welfare Act, or that it intended the Indian tribes in Alaska to exercise jurisdiction in child custody matters until such time as there is satisfactory proof that a particular tribe has the ability to properly adjudicate such cases. 722 P.2d at 222.

Plaintiffs would have this court read *Native Village of Stevens v. Smith*, 770 F.2d 1486 (9th Cir.1985), *cert. den.*, 475 U.S. 1121, 106 S.Ct. 1640, 90 L.Ed.2d 185, to mean that tribal courts in Alaska have exclusive jurisdiction under ICWA regardless of whether they have obtained approval of reassumption. This reading is inappropriate, because the matter was not at issue in that case. The Ninth Circuit in *Native Village of Stevens* affirmed a summary judgment against the Village, on the question of whether the state had to pay AFDC foster care money to the Village as a "public agency ... with whom the State agency ... has made an agreement." 42 U.S.C. § 672(a)(2)(B). Concessions by the State during the litigation prevented judicial determination of whether the Village had made a "judicial determination" cognizable under 42 U.S.C. § 672(a)(1). Since the State of Alaska had made no agreement with Stevens Village, the Court held that the State did not have to pay the AFDC money.

Congress has provided for "partial retrocession" in circumstances not lending themselves to exclusive jurisdiction in tribal courts. The statute provides for "referral jurisdiction" from state court, or exclusive jurisdiction over "limited community or

geographic areas," where a petition does not justify the full range of exclusive jurisdiction.

(2) In those cases where the Secretary determines that the jurisdictional provisions of [section 1911(a)] of this Act are not feasible, he is authorized to accept partial retrocession which will enable tribes to exercise referral jurisdiction as provided in [section 1911(b)] of this Act, or, where appropriate, will allow them to exercise exclusive jurisdiction as provided in [section 1911(a)] over limited community or geographic areas without regard for the reservation status of the area affected.

25 U.S.C. § 1918(b)(2). Plaintiffs' proposed doctrine of implied concurrent jurisdiction would defeat the purpose of the statutory provision for partial retrocession. Referral jurisdiction allows the state court to coordinate competing tribal claims to jurisdiction, with the benefit of clear geographic delineation by the Secretary of Interior. The Department of the Interior interprets the statute to allow special concurrent jurisdiction in a P.L. 280 state by use of the partial retrocession procedure. 44 Fed. Reg. 45092 (1979). ("If a state is asserting exclusive jurisdiction, the tribe may take over all jurisdiction or simply obtain jurisdiction concurrent with the state.")

Plaintiffs' theory of implied residual concurrent jurisdiction cannot be reconciled with the "reassumption" language of the statute: "Any Indian tribe which became subject to State jurisdiction ... may reassume jurisdiction over child custody proceedings." 25 U.S.C. § 1918(a). If the tribe retained jurisdiction, then why would Congress use the phrases "became subject" and "reassume"? The language would more likely have been qualified, perhaps in the form "became partially subject" or "became subject to concurrent jurisdiction," and "reassume exclusive jurisdiction" or "take exclusive jurisdiction." Neither the functions nor the words of the statute lend themselves to plaintiffs' concurrent jurisdiction theory.

Indian tribes in Alaska may obtain exclusive, referral, or concurrent jurisdiction over child custody matters if, and only if, they comply with the reassumption or partial retrocession provisions enacted by Congress.

The doctrine of tribal sovereignty has historically been a two edged sword for American Indian groups. The gain in group self determination comes at the expense of a loss of protection of individual civil liberties by the United States Constitution.

Congress was concerned, when it passed the Indian Child Welfare Act, with "[t]he wholesale separation of Indian children from their families" by non-Indian intervention. 1978 U.S.Code Cong. & Admin. News 7530, 7531. The legislative history quotes the representative remark, "I can remember (the welfare worker) coming and taking some of my cousins and friends." *Id.* at 7530. The House Report says that "[t]he decision to take Indian children from their natural homes is, in most cases, carried out without due process of law." U.S. Code Cong. & Adm.News 7533.

Congress and the Department of the Interior have attempted to protect individual rights against these kinds of violations while advancing tribal self-determination. The absence of protection by the United States Constitution makes the administrative review process absolutely critical. Acceptance of plaintiffs' theory of implied residual concurrent jurisdiction would construe away the statutory and regulatory protection of native parents' and childrens' rights in tribal forums. Congress intended no such result.

Plaintiffs' motion for summary judgment is denied. Defendant's motion for summary judgment is granted.