918 F.2d 797
 NATIVE VILLAGE OF VENETIE I.R.A. COUNCIL; Native Village of
Fort Yukon I.R.A. Council; Nancy Joseph;
Margaret Solomon, Plaintiffs-Appellants,
v.
STATE OF ALASKA; Myra Munson, in her official capacity as
Commissioner of the Department of Health and
Social Services, Defendants-Appellees.
 No. 88-3929.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 9, 1989.
Submission Vacated Aug. 10, 1989.
Resubmitted May 8, 1990.
Decided Nov. 6, 1990.
 
 Judith K. Bush, Alaska Legal Services Corp., Fairbanks, Alaska, for plaintiffs-appellants.
 D. Rebecca Snow, Office of the Atty. Gen., Fairbanks, Alaska, for defendants-appellees.
 Rebecca Craven, Native American Program, Oregon Legal Services, Portland, Or., for amici curiae Confederated Tribes of the Grand Ronde of Oregon.
 Lloyd Benton Miller, Sonosky, Chambers, Sachse & Miller, Anchorage, Alaska, for amici curiae Alaska Federation of Natives.
 Appeal from the United States District Court for the District of Alaska.
 Before O'SCANNLAIN, LEAVY and TROTT, Circuit Judges.
 O'SCANNLAIN, Circuit Judge:
 
 
 1
 We must decide whether federal law requires the state of Alaska to accord "full faith and credit" to child-custody determinations made by the tribal courts of native villages.
 
 
 2
 * The native villages of Venetie and Fort Yukon lie on or above the Arctic Circle in Alaska's frozen tundra. Venetie has a population of 132, according to the 1980 census, all but three of whom are native. Five hundred and eighty-six people reside in Fort Yukon; 442 are native.
 
 
 3
 The native villages are organized under the Indian Reorganization Act ("I.R.A."). See 25 U.S.C. Sec. 476 (1988). The villages' I.R.A. councils, two of the plaintiffs in this action, are the duly organized and elected governing bodies of the native villages.
 
 
 4
 Plaintiff Margaret Solomon is an Athabascan Indian from the Native Village of Fort Yukon. In the fall of 1985, Solomon was asked whether she would adopt a child born on September 28, 1985. She went to Fairbanks to pick up the infant, then eight days old. On May 27, 1986, the tribal court of the Native Village of Fort Yukon purported to formalize the adoption. Subsequently, in October 1986, Alaska denied Solomon benefits under the Aid to Families with Dependent Children program. State welfare officials informed Solomon that the state would not recognize the purported adoption and that the child was therefore not eligible for AFDC benefits.
 
 
 5
 Nancy Joseph is also an Athabascan Indian from the Native Village of Fort Yukon. One of Joseph's relatives, an expectant mother, asked Joseph to adopt the baby following the child's birth. Joseph agreed, and took the child home from the hospital shortly after his birth on February 24, 1986.
 
 
 6
 As the child's natural mother was from Venetie, she consented to the adoption in the tribal court of the Native Village of Venetie. Joseph subsequently requested a substitute birth certificate showing her to be the child's mother. However, the Bureau of Vital Statistics of the state of Alaska denied the request, observing that the Bureau "does not give recognition to native or tribal council adoption orders at this time."[1]
 
 
 7
 In June 1986, Joseph was laid off her job at the University of Alaska. After she had exhausted her unemployment benefits, she applied for AFDC benefits. On October 20, 1986, the Division of Public Assistance denied Joseph's application, informing her that "the courts have not recognized the Tribal adoption of the child. You should reapply when you can prove that you are the mother of the child."[2]
 
 
 8
 Ms. Joseph, Ms. Solomon, the Native Village of Venetie I.R.A. Council, and the Native Village of Fort Yukon I.R.A. Council brought this suit in the United States District Court for the District of Alaska. They sought to enjoin the state of Alaska and certain of its officials from refusing to recognize the tribal court adoptions.[3] The plaintiffs asserted that under the Indian Child Welfare Act of 1978 ("Act"), 25 U.S.C. Secs. 1901-1963 (1988), Alaska was required to give full faith and credit to the native-village adoption decrees. See id. Sec. 1911(d). Both the plaintiffs and defendants moved for summary judgment. In a thorough and comprehensive opinion, the district court dismissed the plaintiffs' claims. See Native Village of Venetie I.R.A. Council v. State of Alaska, 687 F.Supp. 1380 (D.Alaska 1988). This timely appeal followed.
 
 II
 
 9
 We first consider whether the district court had jurisdiction to hear the plaintiffs' grievances.
 
 
 10
 * Since our jurisdiction is limited, we must determine whether federal courts have been empowered to hear this controversy. We begin with the claims of the native village plaintiffs. Congress has granted to federal district courts "original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States." 28 U.S.C. Sec. 1362 (1988). The parties do not disagree that the "matter in controversy" here arises under the federal Indian Child Welfare Act. Rather, it is disputed whether the native villages are a "tribe or band" for purposes of this section.
 
 
 11
 We recently identified two factors which a court may consider to determine whether an Indian group is such a "tribe or band" with a "duly recognized" governing body within the meaning of section 1362: (1) whether the Indian group has a governing body approved by the Secretary of the Interior under regulations issued pursuant to 25 U.S.C. Sec. 476, or (2) whether the Indian group is a group or village listed as a native village in the Alaska Native Claims Settlement Act, 43 U.S.C. Sec. 1610(b)(1). See Native Village of Noatak v. Hoffman, 896 F.2d 1157, 1160 (9th Cir.), cert. granted, --- U.S. ----, 111 S.Ct. 37, 112 L.Ed.2d 14 (1990). The native villages of Venetie and Fort Yukon satisfy both criteria. See, e.g., 43 U.S.C. Sec. 1610(b)(1) (1982). Accordingly, they properly invoked federal jurisdiction under section 1362.
 
 
 12
 As to the individual plaintiffs, Joseph and Solomon, the district court had jurisdiction over their claims under 28 U.S.C. Sec. 1331. In Snow v. Quinault Indian Nation, 709 F.2d 1319 (9th Cir.1983), cert. denied, 467 U.S. 1214, 104 S.Ct. 2655, 81 L.Ed.2d 362 (1984), we held that an action which raised "the issue of tribal sovereign powers," even if raised by an individual rather than a tribe, was "a sufficient federal question ... upon which to base Sec. 1331 jurisdiction." Id. at 1321. Joseph's and Solomon's claims, as well as those of the native villages, raise the issue of the inherent tribal sovereignty of the native villages. As such, the district court possessed jurisdiction over these claims under section 1331.
 
 B
 
 13
 Alaska argues that the villages' suit is barred by the eleventh amendment. This question was also resolved in Noatak. We held that the states had consented to suit against them by Indian tribes when such states joined the Union, and that this consent extended to suits by native villages in Alaska. See Noatak, 896 F.2d at 1162-65. The eleventh amendment therefore does not bar the native villages from pursuing this action.[4]
 
 
 14
 The claims of Joseph and Solomon are, however, barred by the eleventh amendment to the extent that retroactive relief is sought. See Green v. Mansour, 474 U.S. 64, 68, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985). Nonetheless, we agree with the district court--and Alaska does not seriously challenge this holding--that the eleventh amendment does not bar Joseph's and Solomon's requests for injunctive relief against the Commissioner of the Department of Health and Social Services. See Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).
 
 
 15
 Whether Joseph's and Solomon's requests for declaratory relief survive eleventh amendment scrutiny is less clear. In Green v. Mansour, the Supreme Court concluded that declaratory relief is impermissible where such relief would "have much the same effect as a full-fledged award of damages or restitution by the federal court," the very type of relief forbidden by the eleventh amendment. 474 U.S. at 73, 106 S.Ct. at 428. Put another way, declaratory relief is not available if its sole efficacy would be as res judicata in a subsequent state court action for retroactive damages or restitution. Id. at 72-73, 106 S.Ct. at 428. However, such is not the case here. Not only has Alaska refused to recognize the native village tribal court adoptions in the past, it continues to do so in the present, and will apparently continue to refuse recognition in the future. Thus, if this refusal is ultimately determined to be unlawful, the grant of declaratory relief can most properly be described as "a mere case-management device that is ancillary to a judgment awarding valid prospective relief." Id. at 71, 106 S.Ct. at 427. Joseph's and Solomon's request for declaratory relief is not barred by the eleventh amendment.
 
 C
 
 16
 Alaska argues that the plaintiffs have not alleged any federal causes of action. Specifically, it urges that statutory "full faith and credit" clauses, such as that contained in the Indian Child Welfare Act, do not automatically give rise to a federal cause of action. Alaska does not specifically challenge plaintiffs' other causes of action. However, since the failure to state a federal cause of action necessarily implicates this court's subject-matter jurisdiction, see Ellis v. Cassidy, 625 F.2d 227, 229 (9th Cir.1980), we consider nostra sponte each alleged cause of action.
 
 
 17
 Again, we begin with the native villages' causes of action. The plaintiffs allege that the defendants' actions deprived the native villages of rights secured under the "federally-protected inherent right of self-governance." Complaint p 17. In Noatak, we held that Noatak had properly invoked federal subject-matter jurisdiction by alleging that "the Commissioner [of the Department of Community and Regional Affairs of the State of Alaska] violated federal laws and policies intended to further tribal self-government." 896 F.2d at 1165; see also Chilkat Indian Village v. Johnson, 870 F.2d 1469, 1474-75 (9th Cir.1989) (Alaska native village's allegations of sovereign power, as a "matter of federal statute and 'reserved powers,' " was a cognizable question under federal common law). Therefore, the native villages have alleged a valid cause of action.
 
 
 18
 The villages may not be able to obtain the particular relief they desire under this cause of action, however, if Congress specifically intended that a federal cause of action not accrue under the Indian Child Welfare Act's full faith and credit clause. A specific congressional directive would trump the general rule. Cf. Green v. Bock Laundry Machine Co., 490 U.S. 504, 109 S.Ct. 1981, 1992, 104 L.Ed.2d 557 (1989) ("A general statutory rule usually does not govern unless there is no more specific rule."). Thus, if Congress did not intend to permit tribes to sue in federal court to determine their rights under the Act's full faith and credit clause, such a restriction would prevent tribes from obtaining relief under the cause of action based on the right of self-governance.
 
 
 19
 As authority for its contention that no right of action exists under the Act's full faith and credit clause, Alaska cites the Supreme Court's recent decision in Thompson v. Thompson, 484 U.S. 174, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988). There the Court held that the full faith and credit clause of the Parental Kidnapping Prevention Act of 1980, see 28 U.S.C. Sec. 1738A (1988), does not give rise to a cause of action in favor of the individual litigants in a custody dispute. See Thompson, 484 U.S. at 187, 108 S.Ct. at 520. Alaska errs, however, in seeking to impose upon Indian law doctrines from other fields of law. Because of the unique legal status of Indians in American jurisprudence, legal doctrines often must be viewed from a different perspective from that which would obtain in other areas of the law. See, e.g., White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 143, 100 S.Ct. 2578, 2583, 65 L.Ed.2d 665 (1980) ("The unique historical origins of tribal sovereignty make it generally unhelpful to apply to federal enactments regulating Indian tribes those standards of pre-emption that have emerged in other areas of the law."). Moreover, "standard principles of statutory construction do not have their usual force in cases involving Indian law." Montana v. Blackfeet Tribe of Indians, 471 U.S. 759, 766, 105 S.Ct. 2399, 2403, 85 L.Ed.2d 753 (1985). Rather, "[t]he canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians." Oneida County v. Oneida Indian Nation, 470 U.S. 226, 247, 105 S.Ct. 1245, 1258, 84 L.Ed.2d 169 (1985). Statutes are to be construed liberally in favor of the Indians; ambiguous provisions are to be interpreted to the Indians' benefit. Blackfeet Tribe, 471 U.S. at 766, 105 S.Ct. at 2403.
 
 
 20
 With the foregoing principles of Indian law in mind, we see no reason that Congress would not have intended to give Indian tribes access to federal courts to determine their rights and obligations under the Indian Child Welfare Act. The Act includes an express congressional finding that state courts and agencies have often acted contrary to the interests of Indian tribes:
 
 
 21
 Congress finds ... that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families.
 
 
 22
 25 U.S.C. Sec. 1901(5) (1988). It would thus be ironic indeed if Congress then permitted only state courts, never believed by Congress to be the historical defenders of tribal interests, to determine the scope of tribal authority under the Act.
 
 
 23
 In addition, Congress's intention to create a tribal cause of action under the Act can be inferred from Congress's understanding of the law at the time the Act was enacted. The intention of Congress can be gleaned, at least in part, by reference to prior law, as Congress is presumed to be knowledgeable about existing law pertinent to any new legislation it enacts. See Goodyear Atomic Corp. v. Miller, 486 U.S. 174, 184-85, 108 S.Ct. 1704, 1711-12, 100 L.Ed.2d 158 (1988). Thus, Congress can be presumed to know that statutes passed for the benefit of Indian tribes will be liberally construed in favor of such tribes. See, e.g., United States v. Southern Pac. Transp. Co., 543 F.2d 676, 687 (9th Cir.1976); Pence v. Kleppe, 529 F.2d 135, 140 (9th Cir.1976); Holt v. Commissioner, 364 F.2d 38, 40 (8th Cir.1966), cert. denied, 386 U.S. 931, 87 S.Ct. 952, 17 L.Ed.2d 805 (1967). Congress can also be presumed to know that the federal courts routinely resolve questions of tribal sovereignty as they are implicated by various acts of Congress. See, e.g., Joint Tribal Council of Passamaquoddy Tribe v. Morton, 528 F.2d 370, 376-79 (1st Cir.1975) (Passamaquoddy Tribe was "tribe" within meaning of Nonintercourse Act, 25 U.S.C. Sec. 177); Crowe v. Eastern Band of Cherokee Indians, Inc., 506 F.2d 1231, 1236-37 (4th Cir.1974) (establishing impact of Indian Civil Rights Act, 25 U.S.C. Secs. 1301-1341, on tribal sovereignty). If Congress did not seek to have such principles applied to the interpretation of the Indian Child Welfare Act, we presume that it would have said so. Thus we must conclude that the villages may seek determination of their rights under the Act in federal court.
 
 
 24
 As to Joseph's and Solomon's individual causes of action under the Indian Child Welfare Act, the same reasoning applies. The Act's full faith and credit clause does not restrict its rights to tribes. See 25 U.S.C. Sec. 1911(d) (1988). Indeed, promotion of the stability of Indian families is a major objective of the Act. See 25 U.S.C. Sec. 1902 (1988) ("[t]he Congress hereby declares that it is the policy of this nation ... to promote the stability and security of Indian tribes and families ") (emphasis added); 25 U.S.C. Sec. 1901(4) (1988) ("Congress finds ... that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies."). Without a cause of action under the Indian Child Welfare Act, Joseph and Solomon would be essentially left without a remedy. We cannot conceive that Congress intended such a self-defeating result.[5]
 
 
 25
 As their final cause of action, the plaintiffs have alleged that Alaska's actions deprived them of their constitutional rights of substantive due process and freedom of association. See Complaint p 17. The district court did not address these allegations in its order granting summary judgment. Absent an initial review of these claims by the district court, we decline to express an opinion as to their merit in any respect.[6]
 
 III
 
 26
 Our jurisdiction thus established, we turn to the substantive issues implicated in this action.[7]
 
 
 27
 Congress enacted the Indian Child Welfare Act in 1978 pursuant to the national policy "to protect the best interests of Indian children and to promote the stability and security of Indian tribes." 25 U.S.C. Sec. 1902 (1988). To promote this policy, Congress established in the Act "minimum Federal standards for the removal of Indian children from their families" and sought to ensure "the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." Id.[8]
 
 
 28
 As the primary mechanism for advancing its objectives in the Act, Congress created a comprehensive jurisdictional scheme for the resolution of custody disputes involving Indian children. This scheme expanded the role of tribal courts and correspondingly decreased the scope of state court jurisdiction. Indeed, state courts are powerless to resolve child-custody disputes concerning Indian children who reside on their tribal reservations; jurisdiction is exclusive in the tribe. See id. Sec. 1911(a). In the case of Indian children who do not reside or are not domiciled on their tribe's reservation, state courts may exercise jurisdiction concurrent with tribal courts. However, the state court must refer the dispute to the appropriate tribal court unless good cause is shown for the retention of state court jurisdiction. See id. Sec. 1911(b); see also Mississippi Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 109 S.Ct. 1597, 1601-02, 104 L.Ed.2d 29 (1989) ("Section 1911(b) ... creates concurrent but presumptively tribal jurisdiction in the case of children not domiciled on the reservation...."). Most importantly, whether such tribal jurisdiction is concurrent with or exclusive of state jurisdiction, all courts in the United States must give full faith and credit to the child-custody determinations of tribal courts to the same extent that full faith and credit are given to the decisions of any other entity. See 25 U.S.C. Sec. 1911(d) (1988).
 
 
 29
 For some tribes, the exclusive and referral jurisdiction provisions of sections 1911(a) and (b) became effective automatically following the enactment of the Act. However, tribes located within so-called Public Law 280 states,[9] which include Alaska, can invoke such jurisdiction only after petitioning the Secretary of the Interior. See id. Sec. 1918(a). Upon receipt of a proper petition, the Secretary has several options. He may grant the tribe exclusive jurisdiction over the entire reservation as provided in section 1911(a), allow the tribe to exercise exclusive jurisdiction only over limited community or geographic areas, or permit the tribe to exercise only referral jurisdiction pursuant to section 1911(b). See id. Sec. 1918(b)(2).
 
 
 30
 The Indian Child Welfare Act includes Alaska natives within its definition of "Indians." See id. Sec. 1903(3). Similarly, Alaska native villages are "Indian tribes" within the meaning of the Act. See id. Sec. 1903(8); 43 U.S.C. Sec. 1602(c) (1982). The parties agree that Venetie and Fort Yukon come within the meaning of "Alaska Native Village" as defined by this Act. Similarly, both Ms. Joseph and Ms. Solomon are members of such an Alaska Native Village. Alaska, however, is a Public Law 280 state. Accordingly, the state contends that these native villages cannot exercise any child-custody jurisdiction unless and until they apply to the Secretary of the Interior and receive his approval as described above. The villages, on the other hand, maintain that they have, at the very least, concurrent jurisdiction by virtue of their inherent sovereignty.
 
 
 31
 In order to resolve this dispute, we must confront two issues. First, we must inquire whether the native villages are inherently sovereign, at least insofar as domestic relations or child-custody issues are concerned. Second, if such villages are possessed of such sovereignty, we must determine whether Congress has stripped the villages of that aspect of sovereign authority which encompasses child-custody determinations. We address each question in turn.
 
 IV
 
 32
 The native villages of Venetie and Fort Yukon contend that they are sovereigns. Indeed, they argue that they are possessed of the same sovereignty as are Indian tribes in the lower forty-eight states. To address this contention, we must examine why Indian tribes in the continental United States are recognized as sovereign. If the rationales for sovereignty of such Indian tribes are equally applicable to Alaskan native villages, then we must conclude that they, too, are sovereigns.
 
 
 33
 "Indian tribes consistently have been recognized ... as 'distinct, independent political communities' qualified to exercise powers of self-government, not by virtue of any delegation of powers, but rather by reason of their original tribal sovereignty." F. Cohen, Handbook of Federal Indian Law 232 (1982 ed.) (quoting Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 559, 8 L.Ed. 483 (1832)). This is the view taken by the Supreme Court:
 
 
 34
 The powers of Indian tribes are, in general, inherent powers of a limited sovereignty which has never been extinguished. Before the coming of the Europeans, the tribes were self-governing sovereign political communities. Like all sovereign bodies, they then had the inherent power to prescribe laws for their members and to punish infractions of those laws.
 
 
 35
 United States v. Wheeler, 435 U.S. 313, 322-23, 98 S.Ct. 1079, 1085-86, 55 L.Ed.2d 303 (1978) (citations, quotations, and emphasis omitted). In short, Indian tribes are currently recognized as sovereign because they were, in fact, sovereign before the arrival of non-natives on this continent.
 
 
 36
 The practical result of this doctrine is that an Indian tribe need not wait for an affirmative grant of authority from Congress in order to exercise dominion over its members. See Montana v. United States, 450 U.S. 544, 564, 101 S.Ct. 1245, 1258, 67 L.Ed.2d 493 (1981) ("the Indian tribes retain their inherent power to determine tribal membership, to regulate domestic relations among members, and to prescribe rules of inheritance for members"); Washington v. Confederated Tribes of the Colville Indian Reservation, 447 U.S. 134, 152, 100 S.Ct. 2069, 2081, 65 L.Ed.2d 10 (1980) ("[t]he power to tax ... is a fundamental attribute of sovereignty which the tribes retain unless divested of it by federal law or necessary implication of their dependent status"). Sovereign authority is presumed until Congress affirmatively acts to take such authority away. See, e.g., Wheeler, 435 U.S. at 323, 98 S.Ct. at 1086 ("until Congress acts, the tribes retain their existing sovereign powers"). One noted commentator (a distinguished member of this Court) explains: "The point to be emphasized is that when a question of tribal power arises, the relevant inquiry is whether any limitation exists to prevent the tribe from acting, not whether any authority exists to permit the tribe to act." W. Canby, American Indian Law 71-72 (2d ed.1988) (emphasis in original).[10]
 
 
 37
 In accordance with this doctrine of inherent tribal sovereignty, it follows that the Indian groups to be recognized as sovereigns should be those entities which historically acted as bodies politic, particularly in the periods prior to their subjugation by non-natives. There is, however, an additional prerequisite that an Indian group must meet in order to achieve present-day recognition as a sovereign: the modern-day group must demonstrate some relationship with or connection to the historical entity. See United States v. State of Washington, 641 F.2d 1368, 1372-73 (9th Cir.1981), cert. denied, 454 U.S. 1143, 102 S.Ct. 1001, 71 L.Ed.2d 294 (1982); Mashpee Tribe v. New Seabury Corp., 592 F.2d 575, 585-87 (1st Cir.), cert. denied, 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 90 (1979). In United States v. State of Washington, we held that in order for a group of Indians to enjoy the benefits of a treaty between the federal government and the tribe from which the Indians descended, the "group [of Indians] must have maintained an organized tribal structure." State of Washington, 641 F.2d at 1372. "[T]ribal status is preserved," we held, "if some defining characteristic of the original tribe persists in an evolving tribal community." Id. at 1372-73.
 
 
 38
 This requirement has been interpreted liberally in favor of Indian groups. "[C]hanges in tribal policy and organization attributable to adaptation do not destroy tribal status." Id. at 1373. We have been particularly sympathetic to changes wrought as a result of dominion by non-natives. See id.; see also Mashpee Tribe, 592 F.2d at 586 ("if a group of Indians has a set of legal rights by virtue of its status as a tribe, then it ought not to lose those rights absent a voluntary decision made by the tribe") (emphasis added). In general, we have continued to recognize tribal existence unless the tribe has voluntarily sought, and achieved, assimilation into non-Indian culture. See State of Washington, 641 F.2d at 1373 ("When assimilation is complete, those of the group purporting to be the tribe cannot claim tribal rights."); Mashpee Tribe, 592 F.2d at 587 ("If all or nearly all members of a tribe chose to abandon the tribe, then, it follows, the tribe would disappear."). In sum, a relationship between the modern-day entity seeking tribal status and the Indian group of old must be established, but some connection beyond total assimilation is generally sufficient.[11]
 
 
 39
 With these fundamental concepts in mind, we turn to Alaska. Following the United States' purchase of Alaska in 1867, Congress paid little heed to the region's natives and was content to leave their legal status unresolved. The courts, however, could not escape the issue so easily.[12] In a series of cases, Judge Matthew Deady, a federal district judge with chambers in the Pioneer Courthouse in Portland, Oregon, but occasionally sitting on the circuit court with jurisdiction extending to Alaska, held that Alaska was not "Indian country" for purposes of either the Indian Intercourse Act or the Revised Statutes of the United States. See United States v. Seveloff, 27 F.Cas. 1021, 1022 (D.Or.1872) (No. 16,252); Waters v. Campbell, 29 F.Cas. 411, 411-12 (C.C.D.Or.1876) (No. 17,264); Kie v. United States, 27 F. 351, 352-55 (C.C.D.Or.1886). Ultimately, a newly-created federal district court for Alaska expanded Judge Deady's view and declared that Alaska native groups were not independent sovereigns. The Alaska district court concluded that "[t]he United States has at no time recognized any tribal independence or relations among these Indians, ... [and that] they have been and now are regarded as dependent subjects." In re Sah Quah, 31 F. 327, 329 (D.Alaska 1886); see also id. ("their system is essentially patriarchal, and not tribal").
 
 
 40
 As a result of these decisions, Alaska natives were treated as divorced from the rules of Indian law which applied to lower-forty-eight tribes. See Native Village of Venetie, 687 F.Supp. at 1393 ("The law of aboriginal peoples in Alaska has remained distinct from Indian law for the continental United States, because of the different historical path taken in Alaska."); Harring, supra, at 293 n. 103 ("The cumulative effect of Deady's opinions was to deprive Alaska natives of the same right to sovereignty over their political affairs that Indians in the rest of the United States had."). The district court in the case at bar believed that a partial reconciliation had occurred: "Since Sah Quah, Alaska has been partially assimilated to the national body of Indian law." 687 F.Supp. at 1393.
 
 
 41
 The district court erred, however, in believing that reconciliation was even necessary. Judge Deady's superannuated views of tribal sovereignty notwithstanding, such notions are not the law of the land today. Rather, if native groups in Alaska were sovereign prior to the incorporation of the land mass into the United States, they could lose their sovereignty only by express act of Congress or assimilation by the natives into non-native culture.
 
 
 42
 Indian sovereignty flows from the historical roots of the Indian tribe. See Wheeler, 435 U.S. at 322-23, 98 S.Ct. at 1085-86. Tribal sovereignty exists unless and until affirmatively divested by Congress. See id. at 323, 98 S.Ct. at 1086. Thus, to the extent that Alaska's natives formed bodies politic to govern domestic relations, to punish wrongdoers, and otherwise to provide for the general welfare, we perceive no reason why they, too, should not be recognized as having been sovereign entities.[13] If the native villages of Venetie and Fort Yukon are the modern-day successors to sovereign historical bands of natives, the villages are to be afforded the same rights and responsibilities as are sovereign bands of native Americans in the continental United States.
 
 
 43
 We cannot say on this record, however, whether the predecessors of the native villages of Venetie or Fort Yukon formed such bodies politic. Nor can we say whether Venetie or Fort Yukon can sufficiently trace their origins to such an identifiable historical sovereign that it should be considered the modern-day successor to such an entity.[14] Answers to these questions must be provided, in the first instance, by the district court.[15]
 
 V
 
 44
 Our inquiry cannot end here, however, as all is for naught if Congress has divested the villages of any inherent authority or sovereignty to make child-custody determinations. The state of Alaska contends that such a statutory divestiture exists. Public Law 83-280,[16] the state asserts, stripped the villages of whatever authority they may have had to make child-custody determinations. Alaska contends, and the district court apparently agreed, that Public Law 280 vested the enumerated states with exclusive, not merely concurrent, jurisdiction over civil and criminal matters involving Indians. See Native Village of Venetie, 687 F.Supp. at 1382 ("Some states, called 'Public Law 280 states,' operate under federal statutes stripping tribal courts of most of their traditional jurisdiction, and giving state courts jurisdiction over Indian country in most respects.").
 
 
 45
 Alaska buttresses this contention by invoking section 108 of the Indian Child Welfare Act, which provides that "[a]ny Indian tribe which became subject to State jurisdiction pursuant to [Public Law 280] ... may reassume jurisdiction over child custody proceedings" by following certain procedures. 25 U.S.C. Sec. 1918(a) (1988). Alaska contends that section 1918 would be a meaningless provision if Public Law 280 did not vest exclusive jurisdiction in the states; if jurisdiction is not exclusive in the states, Alaska asks, what is there for the native villages to "reassume" under section 1918?
 
 
 46
 We must begin our analysis of Alaska's argument with a brief overview of Public Law 280. Enacted in 1953, Public Law 280 mandated the transfer of civil and criminal jurisdiction over "Indian country" from the federal government to the governments of five states,[17] and permitted other states to assume such jurisdiction voluntarily. In 1958, Alaska was added to the list of mandatory Public Law 280 jurisdictions. See Act of Aug. 8, 1958, Pub.L. No. 85-615, Sec. 2, 72 Stat. 545. The civil portion of Public Law 280 provides as follows:
 
 
 47
 Each of the [mandatory Public Law 280] States ... shall have jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country listed opposite the name of the State to the same extent that such State has jurisdiction over other civil causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country as they have elsewhere within the State.
 
 
 48
 28 U.S.C. Sec. 1360(a) (1988). It is not disputed that private adoption cases are included within this transfer of civil jurisdiction from the federal government to the states.
 
 
 49
 Although Public Law 280 was enacted during Congress's so-called "termination era" methodology of dealing with Indians,[18] the law "plainly was not intended to effect total assimilation of Indian tribes into mainstream American society." California v. Cabazon Band of Mission Indians, 480 U.S. 202, 208, 107 S.Ct. 1083, 1088, 94 L.Ed.2d 244 (1987). The legislative history behind Public Law 280 is sparse, but Congress's primary motivation in enacting the legislation seems to have been a desire to remedy the lack of adequate criminal-law enforcement on some reservations. See, e.g., S.Rep. No. 699, 83d Cong., 1st Sess., reprinted in 1953 U.S.Code Cong. & Admin.News 2409, 2412 ("[T]here has been created a hiatus in law-enforcement authority that could best be remedied by conferring criminal jurisdiction on States indicating an ability and willingness to accept such responsibility."); see also Bryan v. Itasca County, 426 U.S. 373, 379, 96 S.Ct. 2102, 2106, 48 L.Ed.2d 710 (1976) ("The primary concern of Congress in enacting Pub.L. 280 ... was with the problem of lawlessness on certain Indian reservations, and the absence of adequate tribal institutions for law enforcement."); Goldberg, Public Law 280: The Limits of State Jurisdiction Over Reservation Indians, 22 U.C.L.A.L.Rev. 535, 540-44 (1975). In fact, certain tribes were exempted from the provisions of Public Law 280 because these tribes had a " 'tribal law-and-order organization that function[ed] in a reasonably satisfactory manner.' " Bryan, 426 U.S. at 385, 96 S.Ct. at 2109 (quoting H.R.Rep. No. 848, 83d Cong., 1st Sess. 7, reprinted in 1953 U.S.Code Cong. & Admin.News 2413). In short, Public Law 280 was designed not to supplant tribal institutions, but to supplement them.
 
 
 50
 The Supreme Court has also adopted the view that Public Law 280 is not a divestiture statute. See Cabazon Band of Mission Indians, 480 U.S. at 207-12, 107 S.Ct. at 1087-89; Bryan, 426 U.S. at 383-90, 96 S.Ct. at 2108-11; see also Walker v. Rushing, 898 F.2d 672, 675 (8th Cir.1990) ("Public Law 280 did not itself divest Indian tribes of their sovereign power to punish their own members for violations of tribal law. Nothing in the wording of Public Law 280 or its legislative history precludes concurrent jurisdiction."). In Bryan, the Court observed that "nothing in [Public Law 280's] legislative history remotely suggests that Congress meant the Act's extension of civil jurisdiction to the States should result in the undermining or destruction of such tribal governments as did exist and a conversion of the affected tribes into little more than 'private voluntary organizations.' " 426 U.S. at 388, 96 S.Ct. at 2111 (quoting United States v. Mazurie, 419 U.S. 544, 557, 95 S.Ct. 710, 718, 42 L.Ed.2d 706 (1975)). The Court has rejected all interpretations of Public Law 280 which would result in an undermining or destruction of tribal governments. See, e.g., Cabazon Band of Mission Indians, 480 U.S. at 222, 107 S.Ct. at 1095 ("[s]tate regulation [of tribal bingo operation] would impermissibly infringe on tribal government" and therefore is not within Public Law 280's jurisdictional grant); Bryan, 426 U.S. at 388, 96 S.Ct. at 2110-11 ("[U]ndermining or destruction of such tribal governments ... [is] a possible result if tribal governments and reservation Indians were subordinated to the full panoply of civil regulatory powers, including taxation, of state and local governments.")
 
 
 51
 In addition, the so-called mandatory Public Law 280 states have, to the extent that they have addressed the issue, considered jurisdiction to be concurrent under Public Law 280. The Wisconsin Attorney General has opined that "[f]or nonregulatory proceedings, such as voluntary termination of parental rights, the tribal courts, and state courts pursuant to Pub.L. 280, have concurrent jurisdiction." 70 Op.Att'y Gen.Wisc. 237, 243 (1981). Likewise, the Attorney General for the State of Nebraska has written: "[U]nder Public Law 280 the tribe retained substantial inherent tribal authority over civil matters arising in Indian country. While some of this tribal jurisdiction and authority may have been concurrent with state jurisdiction (i.e., existing together with it), or while the Tribe may have chosen not to exercise all of its authority and jurisdiction, nonetheless that tribal jurisdiction and authority was always there." Opinion No. 48, Opinion Letter from Robert M. Spire, Attorney General (Charles E. Lowe, Ass't Att'y General) to State Senator James E. Goll (March 28, 1985).
 
 
 52
 Finally, we note that Congress was aware, while drafting the Indian Child Welfare Act, that the U.S. Department of Justice viewed Public Law 280 as providing for concurrent jurisdiction among state and tribal courts. Then-Assistant Attorney General for Legislative Affairs Patricia M. Wald wrote to Interior and Insular Affairs Committee Chairman Morris K. Udall: "As you may be aware, the courts have consistently recognized that tribal governments have exclusive jurisdiction over the domestic relationships of tribal members located on reservations, unless a State has assumed concurrent jurisdiction pursuant to Federal legislation such as Public Law 83-280." Letter from Assistant Attorney General Patricia M. Wald to Hon. Morris K. Udall (Feb. 8, 1978), included in H.R.Rep. No. 1386, 95th Cong., 2d Sess. 35, reprinted in 1978 U.S.Code Cong. & Admin.News 7530, 7558 (emphasis added).
 
 
 53
 In spite of the foregoing, Alaska suggests that section 108 of the Indian Child Welfare Act would be rendered meaningless by any non-divestiture interpretation of Public Law 280. However, the two statutes can be harmonized without construing Public Law 280 as a divestiture statute. See Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1018, 104 S.Ct. 2862, 2880, 81 L.Ed.2d 815 (1984) (statutes capable of being harmonized should be so construed). The relevant portions of the Indian Child Welfare Act enable the Secretary of the Interior to grant to a tribe, upon receipt of a proper petition, exclusive jurisdiction (over all or a portion of the appropriate "Indian country") or referral jurisdiction of child-custody proceedings. See 25 U.S.C. Sec. 1918(b)(2) (1988). Each of these types of jurisdiction is broader than any tribal jurisdiction which is concurrent with the states. Exclusive jurisdiction, of course, is clearly broader than concurrent jurisdiction. Likewise, referral jurisdiction is broader in scope than concurrent jurisdiction, in that referral jurisdiction is concurrent but presumptively tribal jurisdiction. See id. Sec. 1911(b). Thus, there is something for a tribe to "reassume" under section 1918--namely, exclusive or referral jurisdiction--even if Public Law 280 is read as not divesting the tribes of concurrent jurisdiction.
 
 
 54
 In sum, giving the benefit of doubt to Alaska, we conclude that Public Law 280 and the Indian Child Welfare Act are, at best, ambiguous as to whether states have exclusive or concurrent jurisdiction over child custody determinations where the tribe has not petitioned for exclusive or referral jurisdiction. Of course, ambiguities are to be resolved to the benefit of Indians. Montana v. Blackfeet Tribe, 471 U.S. 759, 766, 105 S.Ct. 2399, 2403, 85 L.Ed.2d 753 (1985). Accordingly, resolving the jurisdictional ambiguities in favor of the villages, we hold that neither the Indian Child Welfare Act nor Public Law 280 prevents them from exercising concurrent jurisdiction. If the native villages of Venetie and Fort Yukon are sovereign entities which may exercise dominion over their members' domestic relations, Alaska must give full faith and credit to any child-custody determinations made by the villages' governing bodies in accordance with the full faith and credit clause of the Indian Child Welfare Act.
 
 VI
 
 55
 We reverse the district court's order granting summary judgment to Alaska. On remand, the district court must determine whether the native villages of Venetie and Fort Yukon are the modern-day successors to an historical sovereign band of native Americans. If the district court determines that either village is a successor to such a sovereign, it must provide the relief necessary to ensure that the state of Alaska affords full faith and credit to adoption decrees issued by the tribal courts of the native village.
 
 
 56
 REVERSED and REMANDED.
 
 
 
 [1]
 Letter from Patricia A. Lee, Supervisor, Special Services Unit, Bureau of Vital Statistics, State of Alaska Department of Health and Social Services, to Michael J. Stancampiano, Bureau of Indian Affairs, June 19, 1986. See Native Village of Venetie v. Alaska, No. CV F86-75 AJK (D.Alaska), Complaint (Nov. 21, 1986), Exhibit 2. Subsequent references to the record are to this case name and number
 
 
 [2]
 Letter from Patricia Donovan, Division of Public Assistance, State of Alaska, to Nancy L. Joseph, Oct. 20, 1986. See Complaint (Nov. 21, 1986), Exhibit 6
 
 
 [3]
 The plaintiffs also sought declaratory relief
 
 
 [4]
 We agree with the district court that even if the eleventh amendment forecloses suits by Indian tribes against the states, the native villages may nonetheless seek injunctive relief against appropriate state officials. See Native Village of Venetie, 687 F.Supp. at 1383-87 (citing Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908))
 
 
 [5]
 We note that even if the reasoning of Thompson v. Thompson, 484 U.S. 174, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988), were somehow relevant here, we would nonetheless be compelled to reach the same result. The Supreme Court observed that one of the chief purposes behind the Parental Kidnapping Prevention Act's full faith and credit provision was to "avoid jurisdictional competition and conflict between State courts." Id. at 177, 108 S.Ct. at 515 (quoting Pub.L. 96-611, 94 Stat. 3569, Sec. 7(c)(5), note following 28 U.S.C. Sec. 1738A). Accordingly, the provision was appropriately described as merely "a rule of decision for courts to use in adjudicating custody disputes." Id. at 183, 108 S.Ct. at 518. The Indian Child Welfare Act, on the other hand, involves more than mere jurisdictional determinations; it provides substantive concerns that a court must consider when making Indian child custody determinations. It follows, then, that a federal court may intervene when a state expressly refuses to abide by these substantive mandates
 
 
 [6]
 Because the district court properly exercised jurisdiction over this action and because its entry of summary judgment is a final order, we have jurisdiction over the appeal under 28 U.S.C. Sec. 1291. See Moran v. Aetna Life Ins. Co., 872 F.2d 296, 298 (9th Cir.1989)
 
 
 [7]
 We review de novo the grant or denial of summary judgment. See Columbia Pictures Industries, Inc. v. Professional Real Estate Investors, Inc., 866 F.2d 278, 279 (9th Cir.1989)
 
 
 [8]
 Congress was motivated to act after it became dissatisfied with the then-existing situation for the adoption of Indian children. See 25 U.S.C. Sec. 1901(4) (1988) (declaring congressional finding "that an alarmingly high percentage of Indian families are broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies and that an alarmingly high percentage of such children are placed in non-Indian foster and adoptive homes and institutions"); id Sec. 1901(5) (declaring congressional finding "that the States, exercising their recognized jurisdiction over Indian child custody proceedings through administrative and judicial bodies, have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families"). See generally Note, Voluntary Adoptions Under the Indian Child Welfare Act of 1978: Balancing the Interests of Children, Families, and Tribes, 63 S.Cal.L.Rev. 213, 214 (1989) (observing that the Act was enacted to "stem the flow of Indian children away from their natural families and tribes by establishing a jurisdictional, procedural, and substantive legal structure that recognizes tribal interests as well as the interests of the Indian children and their families in child custody proceedings")
 
 
 [9]
 Broadly put, Public Law 280 gave to certain enumerated states concurrent jurisdiction over criminal and civil matters involving Indians, where jurisdiction had previously vested only in federal and tribal courts. See infra pp. 809-811
 
 
 [10]
 In McClanahan v. Arizona State Tax Commission, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), the Court suggested that the doctrine of inherent tribal sovereignty might be giving way to the doctrine of federal preemption as the sole basis for limiting state jurisdiction over Indian tribes. See id. at 172, 93 S.Ct. at 1262 ("[T]he trend has been away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance on federal pre-emption."). Drawing on McClanahan, Alaska contends that the native villages cannot successfully invoke inherent sovereignty as a bar to the state's jurisdiction. However, subsequent decisions by the Supreme Court make it clear that the doctrine of inherent sovereignty remains an independent barrier to state jurisdiction over tribal affairs. In White Mountain Apache Tribe, the Court explained:
 [C]ongressional authority and the "semi-independent position" of Indian tribes have given rise to two independent but related barriers to the assertion of state regulatory authority over tribal reservations and members. First, the exercise of such authority may be pre-empted by federal law. Second, it may unlawfully infringe on the right of reservation Indians to make their own laws and be ruled by them. The two barriers are independent because either, standing alone, can be a sufficient basis for holding state law inapplicable to activity undertaken on the reservation or by tribal members.
 448 U.S. at 142-43, 100 S.Ct. at 2583 (emphasis added, citations and quotation omitted). Thus, we reject Alaska's contention that inherent sovereignty cannot be looked to as a bar to state jurisdiction.
 
 
 [11]
 The Secretary of the Interior has promulgated regulations setting forth certain criteria which Indian groups in the continental United States must satisfy in order to achieve "tribal" status. See 25 C.F.R. Sec. 83 (1989). These regulations essentially mirror the factors set forth above--historical origins and continuity. See id. Sec. 83.7(a)-(c). Although these regulations apply only to Indian groups within the lower-48 states, we have found them to be instructive when deciding tribal status for native groups in Hawaii and Alaska. See Price v. State of Hawaii, 764 F.2d 623, 626-27 (9th Cir.1985), cert. denied, 475 U.S. 1091, 106 S.Ct. 1482, 89 L.Ed.2d 736 (1986)
 
 
 [12]
 See generally Harring, The Incorporation of Alaskan Natives Under American Law: United States and Tlingit Sovereignty, 1867-1900, 31 Ariz.L.Rev. 279, 283-84 (1989)
 
 
 [13]
 One commentator has suggested that Alaskan native villages should not be considered sovereigns because of unresolved questions concerning whether such villages occupy "Indian country." See Comment, Alaskan Native Indian Villages: The Question of Sovereign Rights, 28 Santa Clara L.Rev. 875 (1988). But see Note, The Uncertain Legal Status of Alaskan Natives After Native Village of Stevens v. Alaska Management & Planning: Exposing the Fallacious Distinctions Between Alaska Natives and Lower 48 Indians, 31 Ariz.L.Rev. 405, 419-21 (1989) ("[T]he federal government created reservations to 'forestall white-Indian conflicts over lands,' not to recognize the sovereignty of indigenous groups.") (quoting F. Cohen, Handbook of Federal Indian Law 743 (1982 ed.)). However, tribal sovereignty is not coterminous with Indian country. Cf. 25 C.F.R. Sec. 83.7(b) (1989) (in order to achieve federal recognition, a group of Indians need not inhabit formal "Indian country"; inhabitation of "a specific area" or a "community viewed as American Indian" is sufficient). Rather, tribal sovereignty is manifested primarily over the tribe's members. See Duro v. Reina, --- U.S. ----, 110 S.Ct. 2053, 2060, 109 L.Ed.2d 693 (1990) ("the retained sovereignty of the tribes is that needed to control their own internal relations, and to preserve their own unique customs and social order [and].... to prescribe and enforce rules of conduct for [their] own members"); Wheeler, 435 U.S. at 326, 98 S.Ct. at 1088 (powers such as enforcement of internal criminal laws "involve only the relations among members of a tribe [and t]hus, they are not such powers as would necessarily be lost by virtue of a tribe's dependent status"). A tribe's authority over its reservation or Indian country is incidental to its authority over its members. Cf. Duro, 110 S.Ct. at 2056 ("retained sovereignty of the tribe as a political and social organization to govern its own affairs does not include the authority to impose criminal sanctions against a citizen outside its own membership," even if crime occurs on reservation); Brendale v. Confederated Tribes & Bands of Yakima Indian Nation, --- U.S. ----, 109 S.Ct. 2994, 106 L.Ed.2d 343 (1989) (tribe's authority over reservation lands is limited to issues which "imperil the political integrity, economic security or the health and welfare of the tribe"); Confederated Tribes of the Colville Indian Reservation, 447 U.S. at 152, 100 S.Ct. at 2081 (power to tax on reservation is "fundamental attribute of sovereignty" so long as it "significantly involv[es] a tribe or its members")
 
 
 [14]
 The correlation between the present-day group of Indians and any historical sovereign entity need not be perfect. See supra pp. 806-807 (recognizing that changes caused by adaptation do not necessarily destroy an entity's sovereign status). That the native village I.R.A. councils have existed for only some fifty years is in no way dispositive of this issue
 
 
 [15]
 The issue of inherent sovereignty has been presented to us before, at least with respect to the Native Village of Venetie. See State of Alaska v. Native Village of Venetie, 856 F.2d 1384, 1387 (9th Cir.1988). As here, we concluded that whether the Native Village of Venetie was a "tribe" worthy of sovereign recognition was a question of fact to be answered by the district court. See id. The dissenting justices in Native Village of Stevens v. Alaska Management & Planning, 757 P.2d 32 (Alaska 1988), advocated this same general approach, concluding that the issue of the native villages' sovereignty was a question of fact. See id. at 43-50 (Rabinowitz, J., dissenting)
 
 
 [16]
 Public Law 83-280 is not codified at one place in the United States Code. The criminal and civil provisions appear in separate titles. See 18 U.S.C. Sec. 1162 (1988) (criminal); 28 U.S.C. Sec. 1360 (1988) (civil). In accordance with common usage, we shall refer to this public law simply as "Public Law 280."
 
 
 [17]
 The five states were California, Minnesota, Nebraska, Oregon, and Wisconsin
 
 
 [18]
 See Atwood, Fighting Over Indian Children: The Uses and Abuses of Jurisdictional Ambiguity, 36 U.C.L.A.L.Rev. 1051, 1067 n. 68 (1989) (summarizing general scholarly division of federal Indian policy into five discrete periods and noting that "termination era" lasted from 1943 to 1961)