## STATE OF MONTANA DEPARTMENT OF TRANSPORTATION, Plaintiff–Appellee,

v.

Tracy KING, personally and in his capacity as President, Fort Belknap Indian Community Council; Bruce "Buzz" Doney, personally and in his capacity as Director, Fort Belknap Tribal Employment Rights Office; Grant Cochran, personally and in his capacity as Compliance Officer, Fort Belknap Tribal Employment Rights Office, Defendants–Appellants.

No. 98–35002.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 7, 1999.

Decided Sept. 9, 1999.

James L. Vogel, Hardin, Montana, for the appellants.

Joseph P. Mazurek, Attorney General, Sarah Bond, Assistant Attorney General, Helena, Montana, for the appellee.

Before: PREGERSON, TASHIMA, and THOMAS, Circuit Judges.

THOMAS, Circuit Judge:

In this appeal, we are required to decide whether the Fort Belknap Indian Community (the "Community") can regulate the State of Montana's employment practices in performing construction work on a state highway that crosses the reservation. We conclude that the Community lacks the power and jurisdiction to enforce their employment ordinance against the State of Montana for work done on a state-owned right of way and thus affirm the district court's grant of summary judgment.

I

The Fort Belknap Indian Community ("Community") is a federally recognized Indian community comprised of the Gros Ventre and Assiniboine Tribes. Their reservation is located in north-central Mon-

tana, covering an area approximately twenty-eight miles wide from east to west and forty miles in length from north to south. Poverty stalks the reservation. Approximately 70% of the Community members are unemployed; of those fortunate enough to have a job, over 40% live below federal poverty guidelines.

To address the lack of employment opportunities, the Fort Belknap Indian Community Council enacted an affirmative action policy, called the Tribal Employment Rights Ordinance ("TERO"). The TERO regulates the employee relations of covered employers through restrictions on hiring, promotion, transfer, and reduction in force preferences for tribal members, Native Americans who are not tribal members, and spouses of tribal members. The TERO's affirmative action requirements include hiring quotas, special seniority rules, use of the TERO office as an employment source, mandatory advertising, and mandatory cross-cultural training. All covered employers are required by the TERO to secure a permit and pay an annual business fee of $100. Each employee of a covered employer is required to obtain a work permit, which costs $100. Covered employers who are not contractors or subcontractors must pay an annual unemployment fee of 1% of the annual payroll for workers employed on the reservation. Covered employers who are contractors or subcontractors are required to pay a project fee of 2% of the total amount of each contract if a significant part of the contract is to be performed on the reservation, as well as an annual qualification fee. Covered employers who have collective bargaining agreements are required to obtain a written agreement from their union (1) incorporating relevant TERO restrictions, (2) prohibiting the union from assessing dues or initiation fees from Native Americans, and (3) requiring the union to provide a journeyman upgrade and advanced apprenticeship programs to Native Americans.

Between 1957 and 1958, the State of Montana acquired a right of way over the Fort Belknap Indian Reservation in order to construct a highway, now known as Highway 66. The State of Montana acquired the land needed to complete the highway from the United States, which held land in trust for the Community, and individual Native American landowners. As part of the transfer, the State of Montana became responsible for constructing and maintaining the highway. Highway 66 is a federal-aid highway pursuant to the Federal Aid Highways Act of 1956. *See* 23 U.S.C.A. §§ 101 *et seq.* (West 1990 & Supp.1999); *see also Siuslaw Concrete Constr. Co. v. Washington, Dep't of Transp.*, 784 F.2d 952, 953 (9th Cir.1986) (describing the general operation of the federal-aid highways program).

In 1996, Montana's Department of Transportation ("MDOT") began the process of repairing a portion of Highway 66 that crosses the Fort Belknap reservation. Initial work on the highway was done by private contractors, who apparently complied with the TERO by registering with the TERO office, paying the requisite fees, and hiring tribal members to perform various jobs. The second half of the job was performed by MDOT employees. The MDOT and its workers did not comply with the TERO.

Consequently, the TERO office contacted the State of Montana regarding its lack of compliance with the TERO on the second half of the project. The State replied that it would not comply with the TERO because the Community lacked jurisdiction over it and its employees. On August 27, 1996, TERO Director Bruce Doney and TERO Officer Grant Cochran went to the maintenance site and gave each state employee a complaint and a notice of a hearing before a tribal hearings officer for violating the TERO. Although initially Doney demanded that the state crew stop working, the state officials explained the danger of leaving the site without completing some portion of the maintenance. Doney agreed, and the state crew worked until the following day. At the time this case was submitted, the MDOT had not

returned to the site, and the maintenance work remained uncompleted.

On September 3, 1996, the State filed a complaint against tribal officials Tracy King, Bruce Doney, and Grant Cochran (collectively, "King") in the U.S. District Court for the District of Montana, seeking a temporary restraining order, a preliminary injunction, a permanent injunction, and a judgment declaring that it was not required to comply with the TERO. The district court issued a temporary restraining order and a preliminary injunction. Subsequently, the court granted summary judgment in favor of the State.

## II

■■■ The power of self-government held by Indian tribes "arises from their original tribal sovereignty over their members rather than from any constitutional source." *Montana v. Gilham*, 133 F.3d 1133, 1137 (9th Cir.1998) (as amended). Thus, the regulatory and adjudicatory authority of tribes does not derive from the Constitution of the United States, but from "the vestiges of their once absolute authority over their internal affairs." *Id.* at 1136 (citing *Native Village of Venetie I.R.A. Council v. Alaska*, 944 F.2d 548, 556 (9th Cir.1991)). After ceding their lands to the United States, tribes' "rights to complete sovereignty, as independent nations, were necessarily diminished...." *Johnson v. M'Intosh*, 21 U.S. (8 Wheat) 543, 574, 5 L.Ed. 681 (1823). Incorporation into the United States constrained the exercise of tribal power "so as not to conflict with the interests of this overriding sovereignty." *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 209, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978). Thus, tribes are "prohibited from exercising both those powers of autonomous states that are expressly terminated by Congress and those powers inconsistent with their status." *Id.* at 208, 98 S.Ct. 1011 (citation and internal quotation marks omitted). When Indian tribes assumed their present dependent status, they did not possess the authority to regulate or sue the States; in fact, most Indian tribes did not even have forums in which to bring suits against other sovereigns at the time of the constitutional convention. *See Gilham*, 133 F.3d at 1137–38. Further, when the States entered the union, they retained their sovereign immunity that pre-existed the constitutional convention. *See Alden v. Maine*, — U.S. —, 119 S.Ct. 2240, 2246–47, 144 L.Ed.2d 636 (1999); *Gilham*, 133 F.3d at 1136–37. Although the States surrendered some of their inherent sovereignty as a mutual concession to the other States, this surrender was limited to the other States and did not extend to Indian tribes. *See Blatchford v. Native Village of Noatak*, 501 U.S. 775, 781–82, 111 S.Ct. 2578, 115 L.Ed.2d 686 (1991).

■■■ Given this historic backdrop, courts have recognized tribal civil regulatory authority over tribal members as part of a tribe's retained sovereignty. *See United States v. Wheeler*, 435 U.S. 313, 328, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978). Indian tribes also retain some power to regulate non-tribal members engaged in activity on reservation land. *See, e.g., Washington v. Confederated Tribes*, 447 U.S. 134, 152, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980) (recognizing that a tribe had power to impose tax on cigarettes sold to non-members on the reservation). Tribal power, however, is circumscribed over reservation land owned in fee by non-Indians and over reservation land in which non-Indians have acquired property rights substantial enough to be considered "land alienated to non-Indians," such as easements and rights of way. *See Strate v. A–1 Contractors*, 520 U.S. 438, 445, 456, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997). In sum, "[the] exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation." *Montana v. United States*, 450 U.S. 544, 564, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). Thus, Montana's main rule is that absent a treaty or a federal law, a tribe has no civil

regulatory authority over non-tribal members for activities on reservation land alienated to non-Indians.[1] *See id.* at 563–65, 101 S.Ct. 1245.

■■■ The character of the issues involved in this case underscores the applicability of Montana's main rule. Here, the State's action occurred on a right of way crossing the reservation, not on land owned in fee, beneficially or otherwise, by the Community. Federal legislation and regulations permitted the right of way to be transferred from tribal members and the United States to the State of Montana. *See* 25 U.S.C. §§ 323–328 (1952); 25 C.F.R. § 256 (1957). The Community consented to the transfer, and each individual allottee received compensation for the easement. The State agreed to construct and maintain the highway, and the highway is open to the public. The State's activity on the reservation—the activity that the Fort Belknap sought to regulate—was the maintenance of the highway, an activity clearly within the scope of the purpose of the right of way as well as the State's sovereign duty. In fact, as part of the original transfer of the right of way, the State stipulated that it would "construct *and maintain* the highway upon the right of way in a good and workmanlike manner[.]" (Emphasis added.) The State was performing this function when its employees were cited by Fort Belknap officials for violating the TERO.

Thus, Montana's main rule, which is consistent with the origins of tribal power, precludes the Community from exercising regulatory jurisdiction over the State's employment practices on the right of way owned by the State.

1. In applying Montana's main rule to a right of way over a reservation granted to the State of North Dakota, the Supreme Court considered the following factors: (1) the legislation that created the right of way, (2) whether the right of way was acquired by the state with the consent of the tribe, (3) whether the tribe had reserved the right to exercise dominion and control over the right of way, (4) whether the land was open to the public, and (5) whether the right of way was under state control. *See Strate,* 520 U.S. at 455–56, 117

III

■■■ Although recognizing the force of Montana's main rule, King contends that this case falls within its exceptions. The Montana Court recognized two exceptions to the main rule forfending the exercise of tribal power:

> [T]ribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. [First, a] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. [Second, a] tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

450 U.S. at 565–66, 101 S.Ct. 1245.

■■■ The first *Montana* exception does not apply in this case. King argues that the original easement granted to the State created a consensual relationship between the Community and the State. However, transfers of property interests between governmental entities create property rights; they generally do not create continuing consensual relationships. *See Yellowstone County v. Pease,* 96 F.3d 1169, 1176 (9th Cir.1996) (holding that the Crow Allotment Act of 1920 did not create a consensual relationship between a tribe and a state), *cert. denied,* 520 U.S. 1209,

S.Ct. 1404. The Court held that the tribe's loss of the " 'right of absolute and exclusive use and occupation ... implies the loss of regulatory jurisdiction over the use of the land by others.' " *Id.* at 456, 117 S.Ct. 1404 (quoting *South Dakota v. Bourland,* 508 U.S. 679, 689, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993)). We utilized the same analysis in a case similar to *Strate. See Wilson v. Marchington,* 127 F.3d 805, 813 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1516, 140 L.Ed.2d 669 (1998).

117 S.Ct. 1691, 137 L.Ed.2d 818 (1997); *see also County of Lewis v. Allen,* 163 F.3d 509, 515 (9th Cir.1998) (en banc) (stating that Montana's first exception was not meant to apply to "agreements between two governmental entities"). This case involves an intergovernmental transfer of property rights with use by the grantee consistent with the right of way grant. Thus, the consensual exception does not apply.

We also reject King's suggestion that another consensual relationship exists between the Tribe and the State based on the fact that the State's private contractors followed the TERO when it completed the first half of the highway repair project. We point out that by statute, the State of Montana has mandated that all private contractors comply with Indian preference policies for work done on Indian reservations absent certain circumstances. *See* Mont.Code Ann. § 18–1–110(1) (1997). This statute, however, by its terms does not apply to the State's own construction crews. *See id.*

■ We also recognize, as King argues, that the welfare of the Community is harmed by the very high levels of unemployment on the reservation. The Court in *Strate,* however, stated that the second *Montana* exception must be narrowly applied. *See* 520 U.S. at 458, 117 S.Ct. 1404. The exception applies when to hold otherwise would threaten "the right of reservation Indians to make their own laws and be ruled by them." *Id.* at 459, 117 S.Ct. 1404 (citation and internal quotation marks omitted). Thus, the *Strate* Court held that tribal jurisdiction over a highway accident between two non-members on a right of way owned by the State of North Dakota was not necessary to preserve the right of the tribe to "make their own laws and be ruled by them." *See id.; see also Wilson v. Marchington,* 127 F.3d 805, 814–15 (9th Cir.1997) (applying the second *Montana* exception in a narrow manner), *cert. denied,* —— U.S. ——, 118 S.Ct. 1516, 140 L.Ed.2d 669 (1998). A similar result obtains in this case. The Community agreed

to the right of way, and the State of Montana became responsible to maintain the road at its own expense. Thus, the Community's assertion of authority over the State's own employees goes beyond the "internal functioning of the tribe and its sovereignty" and instead impinges on one of the State of Montana's sovereign responsibilities—maintaining Highway 66 and the right of way at its own expense.

Therefore, neither of the *Montana* exceptions applies, and we hold that the Community lacks regulatory jurisdiction over the State's employment practices on the right of way.

## IV

■ We also affirm the district court's ruling that the State of Montana did not need to exhaust tribal remedies prior to bringing suit in federal court. Before the State filed its complaint in district court, the Community filed complaints with the TERO office against the MDOT workers for their failure to comply with the TERO, and a hearing date was set. Thus, King argues that the federal court must defer to the tribal agency until the agency considers whether it has jurisdiction over the state employees.

■ The district court had subject matter jurisdiction under 28 U.S.C. § 1331 "to determine, as a matter arising under federal law, whether a tribal court has exceeded the limits of its jurisdiction." *Strate,* 520 U.S. at 448, 117 S.Ct. 1404 (citation and internal quotation marks omitted); *see also County of Lewis,* 163 F.3d at 513 (citing *Strate* ). As a general rule, however, a federal district court should abstain from asserting federal question jurisdiction over claims that are identical to claims pending in tribal court until the tribal court has had a full opportunity to consider the basis for its own jurisdiction. *See Strate,* 520 U.S. at 449–51, 117 S.Ct. 1404; *Iowa Mut. Ins. Co. v. LaPlante,* 480 U.S. 9, 15, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987) ("[C]onsiderations of

comity direct that tribal remedies be exhausted before the question is addressed by the District Court.").

 There are, however, a few exceptions to the exhaustion rule:

[E]xhaustion [is] not required where an assertion of tribal jurisdiction is motivated by a desire to harass or is conducted in bad faith, or where the action is patently violative of express jurisdictional prohibitions, or where exhaustion would be futile because of the lack of adequate opportunity to challenge the court's jurisdiction.

*Iowa Mut.*, 480 U.S. at 19 n. 12, 107 S.Ct. 971 (citation and internal quotation marks omitted). Additionally, the *Strate* decision added a fourth exception to the exhaustion rule, dispensing with exhaustion "when . . . it is plain that no federal grant provides for tribal governance of nonmembers' conduct on land covered by Montana's main rule. . . ." *Strate*, 520 U.S. at 459 n. 14, 117 S.Ct. 1404.

In this case, because the Community has no regulatory authority to govern the State's conduct on land covered by Montana's main rule, the State was not required to exhaust tribal remedies, whether administrative or judicial.[2]

### V

Courts are often poor forums for resolving difficulties between Indian tribes and States. While we are parsing the nuances of jurisdiction and immunity, poverty continues unabated on the reservation, and the State's highways are left unrepaired. However, solutions to these problems rest with the political branches of each sovereign. Montana has already expressed concern for the welfare of the Community by requiring private contractors to comply with Indian preferences policies for work done on the Reservation. *See* Mont.Code Ann. § 18–1–110(1) (1997). We can but

express the hope that cooperation between these two governments will continue and that they will work together to solve these pressing problems without further judicial intervention.

As to the issues before us, we hold that the State of Montana and its officials are outside of the regulatory reach of the Community's TERO for work performed on the right of way owned by the State. As such, exhaustion of tribal remedies by the State is not required. We express no opinion on the other issues raised in this appeal.

AFFIRMED.

---

**2.** In this instance, there are potentially two tribal forums .in which exhaustion might be required: administrative and judicial. Because the Community lacked regulatory authority, exhaustion is not required in either

forum. We need not, and do not, define the parameters of tribal administrative exhaustion requirements, nor do we need to interpret the interplay between tribal judicial and administrative remedies.